E-FILED
Monday, 20 September, 2010  01:46:53 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

JAMES DOLIS,
            Plaintiff,

        v.                                          08-cv-2085

JOSEPH L. LOFTUS, MARY MILLER,
ANGLIN, AMEJI, LAKER, KILEY,
ROGER WALKER JR., WEXFORD
HEALTH SERVICES, INC.,
            Defendants.

MEMORANDUM OPINION AND ORDER

Before the court are the defendants, Roger Walker, Jr., Kerrick Kiley, David Laker, Mary Miller and Keith Anglin's summary judgment motion [75], Plaintiff's response [92] and Defendants reply [97].  Defendants submit their summary judgment motion and supporting memorandum, pursuant to Federal Rule of Civil Procedure 56.

Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).  The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000).  A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e).  In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).  Further, "[t]he plaintiff cannot merely allege the existence of a factual dispute to defeat summary judgment …. Instead, he must supply evidence sufficient to allow a jury to render a verdict in his favor." *Basith v. Cook County*, 241

F.3d 919, 926 (7th Cir. 2001).  Specifically, the non-moving party "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial."  *Filipovic v. K&R Express Systems, Inc*., 176 F.3d 390, 390 (7th Cir. 1999).  Failure by the non-movant to meet all of the above requirements subjects him to summary judgment on his claims.

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence."  Fed. R. Civ. P. 56(e) (emphasis added).  Personal knowledge may include inferences and opinions drawn from those facts.  *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991).  "But the inferences and opinions must be grounded in observation or other first-hand personal experience.  They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience."  *Visser*, 924 F.2d at 659.  It is also well settled that "conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment.  Keri v. Barod of Trustees of Purdue University, 458 F.3d 620, 628 (7th Cir.2006)(*citing Haywood v. N. Am. Van Lines, Inc.,* 121 F.3d 1066, 1071 (7th Cir.1997)).

Background

Plaintiff filed his complaint on April 7, 2008 [1].  On May 28, 2008, Plaintiff filed an Amended Complaint [7].  On October 6, 2008, the court performed a merit review of Plaintiff's amended complaint and allowed him to proceed on his claims that Defendants were deliberately indifferent to his serious medical needs, conditions of confinement as it relates to soy products, and denial of equal protection of the law.  Defendants contend they are entitled to summary judgment based on the merits of this case, and because Plaintiff failed to exhaust his administrative remedies as to this lawsuit.  The plaintiff claims are as following:

A.  Plaintiff complains that Co-Defendant Mary Miller did not provide medication prescribed to him by Dr. Ameji. Plaintiff also complains that he is not given enough time to exercise and wanted to be transferred.
B.  Plaintiff complains of the treatment provided to him for what he alleges was a stricture in his urethra.
C.  Plaintiff complains of lower gastro-intestinal problems.
D.  Plaintiff complains of issues with his dental care.
E.  Plaintiff complains of hearing loss.
F.  Plaintiff complains of soy in his diet.
G.  Plaintiff alleges he suffered violation of his equal protection rights by not being transferred from the Danville Correctional Center.

Undisputed Material Facts[1]

1.  Plaintiff was an inmate incarcerated at Danville Correctional Center at all times relevant to this lawsuit.
2.  At all times relevant to this Complaint, Defendants Walker, Kiley, Laker, Miller, and Anglin were employees of the Illinois Department of Corrections.
3.  On October 6, 2008, the court screened Plaintiff's Complaint and allowed him to proceed on his claims that Defendants were deliberately indifferent to his serious medical needs, conditions of confinement as it relates to soy products, and denial of equal protection of the law.
4.  Sherry Benton is a Chairperson for the Administrative Review Board.  (Exhibit A).
5.  Benton conducted a review of the ARB's records, and found three grievances written by Plaintiff concerning medical treatment, soy, or equal protection at Danville Correctional Center from 2006 to present.  (Exhibit A, Benton Affidavit).
6.  The ARB's records also contain one grievance where Plaintiff complains of wanting a transfer.  (Exhibit A).
7.  In a grievance dated March 7, 2007, Plaintiff complains of a cavity in his front tooth that needs to be filled.  (Exhibit B).  However, this grievance does not name any individual, and does not even clearly articulate that his problems occurred at Danville Correctional Center.  (Exhibit B).
8.  Plaintiff submitted a grievance dated March 3, 2008, complaining of the amount of soy in the food he was being served.  (Exhibit C).  This grievance, does not name any individual.  (Exhibit C).
9.  The ARB responded to this grievance on July 9, 2008.  (Exhibit C).
10. Plaintiff submitted several grievances dated January 1, 2008, (Exhibit D) wherein he
    a.  asked for a transfer to a different facility, and referenced problems he was having with his heart.  No defendant named in this grievance.
    b.  requested his medical records from Cook County.  No defendant named in this grievance.
    c.  complained about hearing loss and wanted a hearing aid.  No defendant named in this grievance.
    d.  wanted an upper GI.  No defendant named in this grievance.
    e.  complains that he is not receiving all of his medications and alleges that Mary Miller changed the dosage of his medications.  Plaintiff also names Dr. Ameji in

---

[1]Plaintiff disputes a majority of Defendants' Undisputed Material Facts, but does not cite to evidence on the record to support his disputes. Plaintiff disputes several facts by referring to Michelle Babb's 9/10/07 memo which Plaintiff attached to his Motion for Extension to Respond (Doc. 86-1 at 3).  However, the court finds that this document does not disprove any fact asserted by Defendants. The memo Plaintiff refers to is simply a memo explaining to him that if he wants his medical records from Cook County, he needs to write to Cook County and request them. This document is of no consequence to this lawsuit.  Further, the exhibits referred to can be found attached to Defendants' memorandum of law [76].

3

this grievance, but he does not voice any complaints against Dr. Ameji in this grievance.

f.    complains about his urethra stricture and the need for surgery.  He wants to be seen by an urologist or transferred to another facility.  He names no defendant, but says "[s]ince I entered IDOC I informed them (medical personal (sic)) that I have a urethra (sic) stricture for which I need surgery . . . ."

11.    Plaintiff claims that in June 2007, he turned in the sticker tab for a refill on his Mevacor medications, and it was not refilled, despite the fact that the prescription was valid for two more months.  (Complaint at 3).

12.    Overall, Plaintiff claims he was denied his prescribed medication for six months, and now has an irregular heartbeat as a result.  (Complaint at 4).

13.    Plaintiff claims he was harmed because in December of 2007, a doctor at Danville told Plaintiff that he had something wrong with his heart.  (Plaintiff's Dep at 11).

14.    Plaintiff claims that on December 21, 2007, he was given an EKG, which shows he has an irregular heartbeat.  (Complaint at 4).

15.    Plaintiff believes he wrote a grievance to Kerrick Kiley around December 2007 or January 2008.  (Plaintiff's Dep at 18).

16.    In response to this grievance, Plaintiff believes Kiley contacted healthcare, who said there was nothing to indicate Plaintiff has any problems, and there is nothing in Plaintiff's Cook County file to indicate Plaintiff has any problems.  (Plaintiff's Dep at 18, 19).

17.    This is the only grievance that Plaintiff recalls writing to Kiley concerning his heart.  (Plaintiff's Dep at 20).

18.    Plaintiff's master file contains only one grievance written by Plaintiff concerning a heart condition at Danville Correctional Center.  This grievance is dated January 1, 2008, and complains of several medical needs.  (Exhibit E).

19.    On January 25, 2008, Terry Fueyo, Director of Nursing at Danville Correctional Center, wrote a memo to the Grievance Officer in regarding this grievance. (Exhibit E).

20.    Ms. Fueyo's memo states, in relevant part, "It appears inmate has been treated in a systematic and timely fashion for hyper lipidemia.  He is currently on medications for his condition and has received proper monitoring of said treatment.  Alterations of the medication regimen are sometimes necessary and it is common to do so.  He has been encouraged to exercise but I see no statements that he will suffer physical harm if not transferred."  (Exhibit E).

21.    Kiley received the January 1, 2008 grievance on April 4, 2008, and reviewed it the same day.  (Exhibit E).

22.    In his review, Kiley refers to Fueyo's letter, quoting Ms. Fueyo's memo.  Based on this information, Kiley denied the grievance.  (Exhibit E).

23.    Kiley is not a medical professional.  (Exhibit F, Kiley Affidavit).

24.    Plaintiff believes Laker, as a counselor, reviewed the same grievance as Kiley, sometime around December 2007 or January 2008.  (Plaintiff's Dep at 20).

25.    However, the counselor that reviewed the January 1, 2008, grievance was David Smetzer. (Exhibit E).

26.  Plaintiff acknowledges there was no other grievance he wrote to Laker concerning his heart condition.  (Plaintiff's Dep at 21, 22).

27.  If Plaintiff had submitted a medical grievance to Laker, Laker would have ensured that Plaintiff had been evaluated by a physician and received medical care for the complained of condition.  (Exhibit G, Laker Affidavit).

28.  Laker is not a physician, has no medical training, and defers to the decisions of medical professionals.  (Exhibit G).

29.  Plaintiff believes Mary Miller changed his dosage of medication sometime in the six month period before December 2007.  (Plaintiff's Dep at 22-24).

30.  Miller is not a licensed physician.  (Exhibit K).

31.  Miller does not personally fill or deliver prescription medication, and does not have the authority to fill or deliver prescription medications.  (Exhibit K).

32.  Medication prescribed by a doctor is delivered by medical staff, who are employed by Wexford.  (Exhibit K).

33.  Miller did not alter, change, or deny any prescription medication for inmate Dolis. (Exhibit K).

34.  Ms. Fueyo's memo indicates that Plaintiff was receiving medically appropriate treatment, stating in relevant part, "It appears inmate has been treated in a systematic and timely fashion for hyper lipidemia.  He is currently on medications for his condition and has received proper monitoring of said treatment.  Alterations of the medication regimen are sometimes necessary and it is common to do so.  He has been encouraged to exercise but I see no statements that he will suffer physical harm if not transferred."  (Exhibit E).

35.  Plaintiff cannot recall whether or not he sent any grievances he sent to Keith Anglin regarding his heart condition.  (Plaintiff's Dep at 29).

36.  The January 1, 2008 grievance was not reviewed by Warden Anglin, but rather by Warden Loftus.  (Exhibit E).

37.  Plaintiff believes he told Anglin about his heart condition in person, and Anglin said he would get back to him.  (Plaintiff's Dep at 29, 30).

38.  If an inmate had informed Anglin of a serious medical condition, Anglin would have ensured that Plaintiff had been evaluated by a physician and received medical care for the complained of condition.  (Exhibit H, Anglin Affidavit).

39.  Plaintiff has no evidence that Anglin did not check with medical personnel.  (Plaintiff's Dep at 30).

40.  Plaintiff claims he has a urethra stricture for which he previously had a surgery that was only temporarily successful due to a large amount of scar tissue.  (Complaint at 4).

41.  Plaintiff claims he cannot urinate, and that urine just drips out of him.  (Plaintiff's Dep at 31).

42.  Plaintiff claims he needs treatment or surgery.  (Complaint at 5).

43.  Plaintiff claims he wrote "a bunch" of grievances on various issues, and Kiley consolidated the answers and gave an answer for a bunch of them.  (Plaintiff's Dep at 35).

44.  Plaintiff believe he received a response to his grievance about his urethra at the same time he received a response to the grievance on his heart condition.  (Plaintiff's Dep at 35).

45. Plaintiff believes Kiley responded to multiple grievances at once, discussing Plaintiff's heart condition and urethra problem.  (Plaintiff's Dep at 36).

46. It appears that Plaintiff is referring to the January 1, 2008 grievance, which Kiley reviewed on April 4, 2008.  (Exhibit E).

47. The Director of Nursing, Terry Fueyo's memo dated January 25, 2008, states in relevant part that "I see no order to refer inmate to a urologist.  Inmate has had an evaluation for urinary problems onsite and I see no evidence that MD has indicated the need for or ordered further workups."  (Exhibit E).

48. In his review, Kiley refers to Fueyo's letter, quoting the above language.  (Exhibit E).

49. Based on this information, Kiley denied the grievance.  (Exhibit E).

50. Plaintiff believes the grievance on his urinary problems would have gone to Laker, and then to Kiley.  (Plaintiff's Dep at 36).

51. However, the January 1, 2008, grievance that Kiley responded to, was reviewed by David Metzer.  (Exhibit E).

52. Even if Plaintiff had informed Laker of his urethra condition Laker would have ensured that Plaintiff had been evaluated by a physician and received medical care for the complained of condition.  (Exhibit G, Laker Affidavit).

53. Plaintiff claims he spoke to Mary Miller several times about his urethra condition, and she said he would be treated.  (Plaintiff's Dep at 38).

54. Plaintiff believes he spoke with Miller within the first six months after he arrived at Danville, between February and July 2006.  (Plaintiff's Dep at 38, 39).

55. Plaintiff acknowledges that during his time at Danville he has been seen by a doctor for his urinary problem.  (Plaintiff's Dep at 39).

56. Plaintiff was seen by a doctor in February or March of 2006.  (Plaintiff's Dep at 39).

57. On a separate visit, around the beginning of 2006, Plaintiff saw a doctor who was going to do a test by using a Foley catheter.  (Plaintiff's Dep at 39).

58. Plaintiff acknowledges he saw a doctor three times in the beginning of 2006.  (Plaintiff's Dep at 40).

59. Plaintiff would see a doctor for other issues and complain about his urethra problems.  (Plaintiff's Dep at 41).

60. Plaintiff discussed this issue with doctors around ten or twelve times while at Danville.  (Plaintiff's Dep at 41).

61. The Director of Nursing, Terry Fueyo's memo dated January 25, 2008, states in relevant part that "I see no order to refer inmate to a urologist.  Inmate has had an evaluation for urinary problems onsite and I see no evidence that MD has indicated the need for or ordered further workups."  (Exhibit E).

62. Plaintiff believes he probably complained to Anglin about this issue in 2008, but cannot identify any grievance Anglin responded to on this issue.  (Plaintiff's Dep at 45).

63. Plaintiff cannot remember telling Anglin about his urethra condition.  (Plaintiff's Dep at 44).

64. The January 1, 2008 grievance was not reviewed by Warden Anglin, but rather by Joseph Loftus.  (Exhibit E).

65. Plaintiff agrees Anglin probably didn't respond to any grievances on this issue.  (Plaintiff's Dep at 45).

6

66. Plaintiff claims he is bleeding from his rectum.  (Plaintiff's Dep at 45).
67. Plaintiff claims this condition started in 2004, and gradually got worse.  (Plaintiff's Dep at 45, 46).
68. Plaintiff claims that if he sits down on the toilet, the whole toilet is full of blood.  (Plaintiff's Dep at 46).
69. Plaintiff believes he complained to Kiley in the beginning of 2006.  (Plaintiff's Dep at 47).
70. Plaintiff believes Kiley responded to a grievance on this condition in conjunction with responses to the other conditions discussed above.  (Plaintiff's Dep at 48).
71. The January 1, 2008 set of grievances complains of gastrointestinal bleeding, and requests a transfer to a less stressful facility.  (Exhibit E).
72. In response to this grievance, Director of Nursing, Terry Fueyo, wrote a memo dated January 25, 2008, stating in relevant part, "I can find no medical order or medical necessity to find inmate to another facility based on AD/ID criteria.  The Doctor would have to state a medical need to transfer and then it would have to be approved."  Kiley reviewed this memo, and denied Plaintiff's grievance on April 4, 2008, citing the memo from Terry Fueyo.  (Exhibit E).
73. Plaintiff cannot identify any other grievance written on this issue.  (Plaintiff's Dep at 48).
74. Plaintiff cannot identify a specific grievance the he wrote to Laker concerning is gastrointestinal bleeding.  (Plaintiff's Dep at 49).
75. The grievance reviewed by Kiley on this issue was not reviewed by Laker, but rather counselor Metzer.  (Exhibit E).
76. Even if Plaintiff had informed Laker of his gastrointestinal bleeding, Laker would have ensured that Plaintiff had been evaluated by a physician and received medical care for the complained of condition.  (Exhibit G, Laker Affidavit).
77. Plaintiff believes he complained to Miller numerous times about his gastrointestinal bleeding.  (Plaintiff's Dep at 50).
78. Plaintiff believes he first complained in April or May of 2006.  (Plaintiff's Dep at 51).  Each time he complained, Miller told Plaintiff he would be treated or taken care of.  (Plaintiff's Dep at 52).
79. Plaintiff agrees he has seen a doctor on this issue around a dozen times.  (Plaintiff's Dep at 53).
80. Plaintiff has complained of this condition to doctors for years, and basically the whole time he has been at Danville.  (Plaintiff's Dep at 52, 53).
81. Plaintiff claims doctors told him that he would be sent for an upper GI, which was a test to see why he was bleeding.  (Plaintiff's Dep at 53).
82. Several times, Plaintiff was actually tested by doctors.  (Plaintiff's Dep at 54).
83. Plaintiff explains that the doctors gave him cards, and put his blood on there, and then put some kind of dye to determine if its blood.  (Plaintiff's Dep at 54).
84. Plaintiff's claim against Anglin is that he reviewed grievances.  (Plaintiff's Dep at 55).
85. However, Plaintiff cannot identify any grievances that Anglin reviewed on this issue.  (Plaintiff's Dep at 56).
86. Plaintiff does not think Anglin reviewed any grievances on this issue before this complaint was filed.  (Plaintiff's Dep at 58).

87. The January 1, 2008 grievances were not reviewed by Warden Anglin, but rather by Warden Loftus.  (Exhibit E).

88. Plaintiff claims he has been trying unsuccessfully to obtain dental attention.  (Complaint at 6).

89. Plaintiff claims he has two cavities that he never got filled.  (Plaintiff's Dep at 58).

90. Plaintiff acknowledges he saw a dentist who X rayed him, and said he would put Plaintiff on a list to get the cavities filled.  (Plaintiff's Dep at 59).

91. Plaintiff claims he wrote grievances to Kiley on this issue.  (Plaintiff's Dep at 60).

92. Plaintiff believes the grievance he wrote was responded to in conjunction with the grievances on the issues discussed above.  (Plaintiff's Dep at 60).

93. Plaintiff agrees that Kiley would have checked with the health care unit and obtained information in order to respond to the grievance.  (Plaintiff's Dep at 61).

94. The Plaintiff's master file contains only one grievance related to dental care, dated March 7, 2007.  (Exhibit B).

95. This grievance was not responded to by Kiley, but rather grievance officer James Tate.  (Exhibit B).

96. Even if Kiley had been informed of this issue, he would have ensured that Plaintiff had been seen by medical personnel and was receiving treatment.  (Exhibit F, Kiley affidavit).

97. Plaintiff thinks Laker denied a grievance on Plaintiff's dental issues.  (Plaintiff's Dep at 61).

98. The March 7, 2007 grievance complaining about dental care was not reviewed by Laker, but rather counselor Bentancourt.  (Exhibit B).

99. Even if Plaintiff had informed Laker of his dental needs, Laker would have ensured that Plaintiff had been evaluated by medical personnel and received medical care for the complained of condition.  (Exhibit G, Laker Affidavit).

100. Plaintiff believes he brought his dental concerns to Miller's attention.  (Plaintiff's Dep at 63).

101. Plaintiff believes Miller said that they did not have a dentist at Danville, and there is a waiting list to get fillings done.  (Plaintiff's Dep at 63).

102. Miller told Plaintiff he would get the fillings.  (Plaintiff's Dep at 64).

103. Plaintiff was put on the list to get fillings at Danville.  (Plaintiff's Dep at 64).

104. When Plaintiff saw the dentist, the dentist told him he was on the list.  (Plaintiff's Dep at 64).

105. In response to Plaintiff's March 7, 2007, grievance, Dr. Scott, Dental Department, stated "there was no documentation found in the dental chart from Stateville regarding inmate Dolis tooth needing filled.  The first documentation found in his dental chart was on 8/2/06.  At that time, the Dentist from Danville CC noted that inmate Dolis asked about the dark spot on his front tooth and wanted to know if it was a cavity.  The dentist the placed inmate Dolis on the filling list to have tooth #10 and #11 filled.  Inmate Dolis was informed that there was a two year waiting list for fills.  Furthermore, Inmate Dolis is still on the waiting list, but there are several inmates in front of him still waiting." (Exhibit B).

106.    Plaintiff believes Anglin denied a grievance on this issue, but cannot identify a specific grievance.  (Plaintiff's Dep at 65).

107.    Plaintiff does not know whether Anglin checked with medical personnel in responding to this grievance.  (Plaintiff's Dep at 65).

108.    The March 7, 2007 grievance on dental issues was not reviewed by Anglin, but rather Warden Chambers.  (Exhibit B).

109.    Plaintiff claims he was fitted for a hearing aid at Chicago Hearing Aid Society, but did not receive it because it was shipped to IDOC.  (Plaintiff's Dep at 65).

110.    Plaintiff admittedly has not suffered any injury at Danville because of a lack of hearing aid.  (Plaintiff's Dep at 66).

111.    Plaintiff claims he complained to Kiley, and Kiley responded to the grievance stating there is nothing in the medical file to show Plaintiff needed a hearing aid.  (Plaintiff's Dep at 66).

112.    The January 1, 2008 group of grievances complains of needing a hearing aid.  (Exhibit E).

113.    Director of Nursing, Terry Fueyo's memo states that "I could find no documentation related to hearing impairment, however, I will have this inmate assessed for need for audiology consult, and if it is determined to be necessary by proper medical personnel, further intervention up to and including hearing aid."  (Exhibit E).

114.    Kiley responded to Plaintiff's grievance on April 4, 2008, and quoted the above language from Fueyo.  (Exhibit E).

115.    Plaintiff believes Laker reviewed the grievance and then passed it onto Kiley.  (Plaintiff's Dep at 67).

116.    However, the January 1, 2008 grievance was not reviewed by Laker, but rather Metzer.  (Exhibit E).

117.    Even if Laker had reviewed a grievance on this issue, Laker would have ensured that Plaintiff had been evaluated by medical personnel and received medical care for the complained of condition.  (Exhibit G, Laker Affidavit).

118.    Plaintiff admittedly did not complain to Miller on this issue.  (Plaintiff's Dep at 67).

119.    Plaintiff cannot say that he complained to Anglin on this issue.  (Plaintiff's Dep at 67).

120.    Plaintiff never personally spoke to director Walker, and has no evidence that Director Walker ever reviewed his grievances.  (Plaintiff's Dep at 9, 10).

121.    During his tenure as Director, Roger Walker did not receive, review, or respond to offender grievances or grievance related correspondence.  (Exhibit J, Johnson affidavit).

122.    The Administrative Review Board assists the Director by reviewing inmate grievances.  (Exhibit J, Johnson affidavit).

123.    Director Walker would not personally sign responses to grievances.  He had a designee that would sign for him.  (Exhibit J, Johnson affidavit).

124.    Plaintiff claims that IDOC has repeatedly poisoned Plaintiff by continuously serving large quantities of soy to eat, without warning of the dangerous consequences resulting from soy.  (Complaint at 7).

125.    Plaintiff claims that when he eats soy, his throat is messed up and he bleeds profusely.  (Plaintiff's Dep at 68).

126. Plaintiff first believed that soy was causing him problems in the end of 2007. (Plaintiffs's Dep at 71).

127. As soon as he found out what soy was doing, he quit eating the meat products that contain soy.  (Plaintiff's Dep at 138).

128. When Plaintiff stopped eating, he claims he saw the results.  (Plaintiff's Dep at 71).

129. Plaintiff agrees that Kiley, Laker, Miller, and Anglin do not decide what food is served at Danville, rather that the menu is set by someone who works in Springfield.  (Plaintiff's Dep at 80, 81).

130. No doctor has ever examined Plaintiff and told him his symptoms were being caused by soy.  (Plaintiff's Dep at 73).

131. Plaintiff believes he wrote a grievance about his problems with soy sometime around the end of 2007 or beginning of 2008.  (Plaintiff's Dep at 74, 75).

132. The ARB's records contain one grievance written by Plaintiff on March 24, 2008, complaining of the amount of soy in the food served at Danville.  (Exhibit C).

133. Kiley responded to this grievance on April 24, 2008, and stated that "the menu and food items are dictated by Springfield.  There is no substantive evidence that inmates medical and dental problems are directly related to the ingestion of soy. . . this grievance officer talked to dental and inmate can put in a request to see the dentist to discuss the problem with his teeth."  (Exhibit C).

134. Plaintiff believes Laker reviewed the same grievance as Kiley.  (Plaintiff's Dep at 78).

135. The March 24, 2008 grievance was reviewed by Laker on March 25, 2008.  (Exhibit C).

136. Laker's response states "the menu and food items are dictated by Springfield and constantly and continually monitored for freshness, quality, as well as any concerns that may come to light by the FDA.  There is no substantive [evidence] that inmates' medical and dental problems are directly related to the ingestion of soy.  (Exhibit C).

137. Plaintiff claims he spoke to Miller about the amount of soy in the food at Danville, probably around January to August 2008.  (Plaintiff's Dep at 76).

138. Plaintiff believes Anglin reviewed a soy related grievance.  (Plaintiff's Dep at 78).

139. Plaintiff believes it was the same grievance reviewed by Laker and Kiley.  (Plaintiff's Dep at 78).

140. The March 24, 2008 grievance was not reviewed by Warden Anglin, but rather by Warden Loftus.  (Exhibit C).

141. Plaintiff claims he complained to Walker about the soy via a grievance around the end of 2007 or 2008.  (Plaintiff's Dep at 73, 74).

142. The March 24, 2007 grievance complaining of soy was reviewed by the ARB on July 9, 2008.  (Exhibit B).

143. By this time, Plaintiff had stopped consuming soy.  (Plaintiff's Dep at 138).

144. Walker never reviewed this grievance, and did not set the menu of food items at Danville Correctional Center.  (Exhibit J).

145. In this case, Plaintiff claims his equal protection rights were violated because he was denied a transfer, even though "other guys with bad disciplinary records" were transferred.  (Plaintiff's Dep at 83).

146. When asked at his deposition to explain this claim, Plaintiff stated "I was denied a transfer even though other guys with bad disciplinary records, very violent kind where

people are hurt, were transferred.  I believe that was in relation for maybe filing grievances all the time.  (Plaintiff's Dep at 83).

147.   Plaintiff's claim in this lawsuit is one of equal protection, not retaliation.  (Court's order of October 6, 2008).

148.   Plaintiff cannot say how not being transferred is a violation of his equal protection rights.  (Plaintiff's Dep at 88).

149.   Plaintiff's request for a transfer to Centralia Correctional Center was denied because of bed space needs and additional observation was needed.  (Exhibit D).

150.   Plaintiff agrees that Kiley, Laker, Miller have nothing to do with this claim.  (Plaintiff's Dep at 86, 87).


### Discussion and Conclusion

Prison officials violate the Eighth Amendment proscription against cruel and unusual punishment when they display "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  This encompasses a broader range of conduct than intentional denial of necessary medical treatment, but it stops short of "negligen[ce] in diagnosing or treating a medical condition."  Id., at 106.  Neither medical malpractice nor a mere disagreement with a doctor's medical judgment amount to deliberate indifference.  *See, Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.")  Likewise, although a prisoner has the right to receive medical care, he does not have the right to determine the type and scope of care he personally desires. *Coppinger v. Townsend*, 398 F.2d 392, 394 (10 Cir. th 1968), citing, *Lawrence v. Ragen*, 323 F.2d 410, 412 (7th Cir. 1963).  In order to establish an Eighth Amendment violation by a prison official for failure to provide adequate medical care, a prisoner "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 105-106 (1976).  Deliberate indifference requires the prison official to act with a "sufficiently culpable state of mind."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).  Therefore, a prison official cannot be liable under the Eighth Amendment "unless he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  *Farmer* at 847 (1994).  A prison official must reasonably respond to a prisoner's complaints, through the investigation and referral of a plaintiff's complaints, in order to be insulated from liability. *Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006).  Otherwise, "[i]f a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that this prisoner is in capable hands." *Spruill v. Gillis*, 372 F.3d 218 (3rd Cir. 2004).

The Eighth Amendment does not provide that an inmate is entitled to demand specific care, nor does it entitle him to the best care available.  *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).  While the state has "an affirmative obligation under the Eighth Amendment to provide persons in its custody with a medical care system that meets minimal standards of adequacy," (*Meriwether v. Faulkner*, 821 F.2d 408, 411 (7th Cir. 1987)), inmates are not entitled to unqualified access to health care.  *Hudson v. McMillian*, 503 U.S. 1, 112 S.Ct.  995,

11

1000 (1992); *see also, Wilson v. Seiter*, 501 U.S. 294, 111 S.Ct. 2321 (1991).  "A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition."  *Snipes v. Detella*, 95 F.3d 586, 592 (7th Cir. 1996).

Finally, prison administrators must rely on those with medical expertise to assess the needs of inmates and to prescribe treatment.  *McEahern v. Civiletti*, 502 F. Supp. 531, 534 (N.D. Ill. 1980); *see also Allen v. City of Rockford*, 349 F. 3eed 1015, 1020 (7th Cir. 2003) (Government employees are entitled to rely on a physician's determination of the best way to treat a patient). A layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference; it is just a form of failing to provide a gratuitous rescue service.  *Burks v. Raemisch*, 2009 WL 305004 (7th Cir. 2009).  Accordingly, a nonmedical prison official is entitled to summary judgment on a claim of deliberate indifference when he or she reasonably responds to an inmate's complaint of grievance by ensuring the inmate has been evaluated by a physician and received medical care for the complained of condition.  *Johnson v. Doughty*, 433 F.3d 1001, 1010-1012 (7th Cir. 2006).

First, the court must address whether Plaintiff exhausted administrative remedies as required by the Litigation Reform Act.  Pursuant to that act, all prison inmates bringing an action under 42 U.S.C. §1983, with respect to prison conditions, must first exhaust all administrative remedies that may be available to them before being allowed to proceed with the lawsuit. (42 U.S.C. §1997e(a)). Section 1997e(a) specifically provides:

> No action shall be brought with respect to prison conditions under
> section 1983 by a prisoner confined in any jail, prison or other
> correctional facility until such administrative remedies are
> exhausted. 42 U.S.C. §1997e(a).

Section 1997e(a)'s exhaustion requirement is mandatory and applies to all prisoners seeking redress for wrongs occurring in prison.  *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, (2002).  This court lacks discretion to resolve a claim on the merits unless a prisoner has exhausted all administrative remedies available to him.  *See Perez v. Wisconsin Dept. of Corrections*, 182 F.3d 532, 535 (7th Cir.1999).  Pursuit of administrative remedies is necessary no matter what relief the Plaintiff seeks, including monetary damages.  *Booth v. Churner*, 532 U.S. 731, 741, 121 S. Ct. 1819, 1825 (2001).  To sufficiently exhaust all administrative remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require.  *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002).  For an inmate incarcerated in the Illinois Department of Corrections, this exhaustion includes initially seeking redress of complaint through his correctional counselor.  20 Ill. Admin. Code § 504.810. If informal resolution is impossible or the grievance concerns a disciplinary proceeding, the inmate must file a written grievance at the institutional level within 60 days of the discovery of the issue giving rise to the grievance. 20 Ill. Admin. Code 504.810.  An inmate must also appeal

an unfavorable decision to the Director or his designees in the Administrative Review Board. 20 Ill. Admin. Code 504.850.  Therefore, unless a decision has been issued by the Administrative Review Board, an inmate has not fully exhausted his administrative remedies.  The entire process must be completed before suit is filed, completion after suit is filed is insufficient.  *Perez v. Wisconsin Department of Corrections*, 182 F.3d 532, 535 (7th Cir. 1999).

In his grievance dated March 7, 2007, Plaintiff complains of a cavity in his front tooth that needed to be filled.  (Exhibit B).  On July 5, 2007, the ARB responded to this grievance. The defendants correctly assert that the grievance does not name any individual, and does not even clearly articulate that his problems occurred at Danville Correctional Center. (Exhibit B). The defendants argue therefore that Plaintiff's grievance is insufficient to exhaust Plaintiff's dental claims as to any Defendant in this lawsuit, because the Illinois Administrative Code provide that inmate grievances must include the name of each person who is the subject of or who is otherwise involved in the complaint. Ill. Admin.Code tit. 20, § 504.810.

The defendants urge this court to read the language of the statute by focusing on the first sentence.  However, the identification requirement in the first sentence is softened by the second sentence, which clarifies that prisoners need identify names only to the extent practicable. Plaintiff articulated that he needed to have some cavities filled; had been advised the a dentist that he would receive dental service within 4 - 6 months; but later was told by someone there was a two-year waiting list.  He provided the facts the prison officials could reasonably expect from a prisoner in his position.  It would be unreasonable to expect that, for every set of facts, an inmate will be able to peel back layers of bureaucracy and match a disputed decision with the prison employee responsible for that decision.  In fact, the defendants have never even asserted that, when Plaintiff filed his grievances, he *knew* who the person was that would place him on the waiting list. The plaintiff did say in his grievance that the dentist told him he would be placed on the list (plaintiff does not name a dentist as a defendant) and the grievance officer later identified the dentist as Dr. Scott.  However, his grievances were resolved on the merits and not rejected on a procedural ground.  That confirms that, until Dolis filed this lawsuit, his compliance with the grievance procedures was never in question.  Further, grievances are intended to give prison administrators an opportunity to address a shortcoming, not to put individual defendants on notice of a lawsuit. *See Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).  With that understanding, the court must infer that Dolis gave administrators a fair opportunity to address his concerns about his dental needs and therefore, the court finds the plaintiff has exhausted administrative remedies on this claim.

The court now turns to the merit of the plaintiff's claim regarding dental care.  Plaintiff claims he has been trying unsuccessfully to obtain dental attention.  Plaintiff claims he has two cavities that he never got filled. (Plaintiff's Dep at 58).  Plaintiff acknowledges he saw a dentist who X rayed him, and said he would put Plaintiff on a list to get the cavities filled. (Plaintiff's Dep at 59).

13

As to the defendant Kiley, Plaintiff claims he wrote grievances to Kiley on this issue. (Plaintiff's Dep at 60).  Plaintiff believes the grievance he wrote was responded to in conjunction with the grievances on the issues discussed above. (Plaintiff's Dep at 60).  Plaintiff agrees that Kiley would have checked with the health care unit and obtained information in order to respond to the grievance. (Plaintiff's Dep at 61). The Plaintiff's master file contains only one grievance related to dental care, dated March 7, 2007. (Exhibit B).  This grievance was not responded to by Kiley, but rather grievance officer James Tate. (Exhibit B). There is no evidence that Kiley reviewed any grievance on this issue.  Defendants assert that even if Kiley had been informed of this issue, he would have ensured that Plaintiff had been seen by medical personnel and was receiving treatment. (Exhibit F, Kiley affidavit).  Personal involvement is required for liability under § 1983. "Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Vance v. Peters,* 97 F.3d 987, 993 (7th Cir.1996) (*quoting Sheik-Abdi v. McClellan,* 37 F.3d 1240, 1248 (7th Cir.1994)); *see also Gentry v. Duckworth,* 65 F.3d 555, 561 (7th Cir.1995); *Black v. Lane,* 22 F.3d 1395, 1401 (7th Cir.1994).  As Kiley had no personal involvement in the plaintiff's dental claims, Kiley is entitled to summary judgment on this claim.

Dental Claim

As to the defendant Laker, Plaintiff thinks Laker denied a grievance on Plaintiff's dental issues (Plaintiff's Dep at  61). The March 7, 2007 grievance complaining about dental care was not reviewed by Laker, but rather counselor Bentancourt. (Exhibit B). There is no evidence that Laker reviewed any grievance concerning Plaintiff's dental needs.  As Laker had no personal involvement in the plaintiff's dental claim, he is entitled to summary judgment on this claim.

As to the defendant, Miller, Plaintiff believes he brought his dental concerns to Miller's attention. (Plaintiff's Dep at 63).  Plaintiff believes Miller said that they did not have a dentist at Danville, and there is a waiting list to get fillings done. (Plaintiff's Dep at 63).  Miller told Plaintiff he would get the fillings.  (Plaintiff's Dep at 64).  Plaintiff was put on the list to get fillings at Danville.  (Plaintiff's Dep at 64).  When Plaintiff saw the dentist, the dentist told him he was on the list.  (Plaintiff's Dep at 64).  In response to Plaintiff's March 7, 2007, grievance, Dr. Scott, Dental Department, stated "there was no documentation found in the dental chart from Stateville regarding inmate Dolis tooth needing filled.  The first documentation found in his dental chart was on August 2, 2006.  At that time, the Dentist from Danville CC noted that inmate Dolis asked about the dark spot on his front tooth and wanted to know if it was a cavity. The dentist the placed inmate Dolis on the filling list to have tooth #10 and #11 filled.  Inmate Dolis was informed that there was a two year waiting list for fills.  Furthermore, Inmate Dolis is still on the waiting list, but there are several inmates in front of him still waiting." (Exhibit B).  It is clear that Plaintiff had been seen by a dentist and had been put on a waiting list for his teeth to be filled.  As Miller does not treat inmates, there was nothing else to be done.  Because Miller reasonably responded to Plaintiff's complaint by assuring Plaintiff he was on the list to get fillings, Miller is entitled to summary judgment.

As to the defendant, Anglin, Plaintiff believes Anglin denied a grievance on this issue, but cannot identify a specific grievance.  (Plaintiff's Dep at 65).  Plaintiff does not know whether Anglin checked with medical personnel in responding to this grievance.  (Plaintiff's Dep at 65).  The March 7, 2007 grievance on dental issues was not reviewed by Anglin, but rather Warden Chambers. (Exhibit B).  Because there is no evidence that Anglin was ever aware of Plaintiff's dental issues, the court finds that Anglin had no personal involvement and is therefore, entitled to summary judgment on this claim.

Soy Claim

Plaintiff claims that IDOC has repeatedly poisoned him by continuously serving large quantities of soy to eat, without warning of the dangerous consequences resulting from soy.  (Complaint at 7).  Plaintiff claims that when he eats soy, his throat is messed up and he bleeds profusely.  (Plaintiff's Dep at 68).  Plaintiff first believed that soy was causing him problems in the end of 2007.  (Plaintiffs's Dep at 71).  As soon as he found out what soy was doing, he quit eating the meat products that contain soy. (Plaintiff's Dep at 138).  When Plaintiff stopped eating, he claims he saw the results.  (Plaintiff's Dep at 71).  In his March 24, 2008 grievance Plaintiff complains about the amount of soy in the food he was being served.  (Exhibit C).  The ARB timely responded to this grievance on July 9, 2008, after Plaintiff filed his lawsuit.  (Exhibit C).  Therefore, the court finds Plaintiff did not exhaust his claim regarding the amount of soy in his food against any defendant in this lawsuit prior to filing this lawsuit.  Because the grievance process was not completed until after Plaintiff initiated his lawsuit, the plaintiff's soy claim against all the defendants in this case is dismissed, without prejudice, for failure to exhaust administrative remedies prior to filing his lawsuit.  *See Perez v. Wisconsin Department of Corrections*, 182 F.3d 532, 535 (7th Cir. 1999).

The defendants assert that the only January 1, 2008 grievance that plaintiff submitted to the ARB is the one in which the plaintiff asked for a transfer to a different facility and referenced problems he was having with his heart.  Defendants admit that the grievance officer responded to the January 1, 2008 group of grievance in one response.  Therefore, the court assumes the Plaintiff submitted the grievance officer's group response.  Further, the court assumes for purposes of this order that the ARB received that response, but inadvertently failed to address each issue that the grievance officer discussed in his response.  So for purposes of this order only, the court finds Plaintiff has exhausted administrative remedies for the issues in his January 1, 2008 grievance. The court now turns to the merit of the claims.

Request for a transfer based on alleged medical need – a heart condition.

In response to this grievance, Kiley contacted healthcare, who said there was nothing to indicate Plaintiff has any problems, and there is nothing in Plaintiff's Cook County file to indicate Plaintiff has any problems. (Plaintiff's Dep at 18, 19). This is the only grievance that Plaintiff recalls writing to Kiley concerning his heart. (Plaintiff's Dep at 20).  Plaintiff's master file contains only one grievance written by Plaintiff concerning a heart condition at Danville

Correctional Center.  This grievance is dated January 1, 2008, and complains of several medical needs. (Exhibit E). On January 25, 2008, Terry Fueyo, Director of Nursing at Danville Correctional Center, wrote a memo to the grievance officer regarding this grievance. (Exhibit E). Ms. Fueyo's memo states, in relevant part, "[i]t appears inmate has been treated in a systematic and timely fashion for hyper lipidemia.  He is currently on medications for his condition and has received proper monitoring of said treatment.  Alterations of the medication regimen are sometimes necessary and it is common to do so.  He has been encouraged to exercise but I see no statements that he will suffer physical harm if not transferred."   Further, Fueyo wrote,  "I can find no medical order or medical necessity to send inmate to another facility based on AD/ID criteria."  Plaintiff does not provide any documentation to show otherwise.  Then  Kiley received the January 1, 2008 grievance on April 4, 2008, and reviewed it the same day.  In his review, Kiley refers to Fueyo's letter, quoting the above language.  (Exhibit E).  Based on this information, Kiley denied the grievance. (Exhibit E).  Kiley is not a medical professional. (Exhibit, Kiley Affidavit). Because Kiley reasonably responded to Plaintiff's grievance by ensuring the inmate has been evaluated by a physician and received medical care for the complained of condition, he is granted summary judgment on this claim.  Johnson v. Doughty, 433 F.3d 1001, 1010-1012 (7th Cir. 2006).  The defendant Loftus, who has not been served in this litigation, concurred with Kiley's decision.

Plaintiff believes Laker, as a counselor, reviewed the same grievance as Kiley, sometime around December 2007 or January 2008. (Plaintiff's Dep at 20).  However, the counselor that reviewed the January 1, 2008, grievance was David Smetzer, not a defendant.  (Exhibit E). Plaintiff acknowledges there was no other grievance he wrote to Laker concerning his heart condition. (Plaintiff's Dep at 21, 22).  If Plaintiff had submitted a medical grievance to Laker, he would have ensured that Plaintiff had been evaluated by a physician and received medical care for the complained of condition. (Exhibit G, Laker Affidavit).  Further, Laker is not a physician, has no medical training, and defers to the decisions of medical professionals.   Plaintiff does not have any evidence that Laker did not look at Plaintiff's medical history before responding to Plaintiff's grievance.  (Plaintiff's Dep at 21).   Because the defendants reasonably responded to Plaintiff's grievance by ensuring he had been evaluated by a physician and received medical care for the complained of condition, they are entitled to summary judgment. *Johnson v. Doughty*, 433 F.3d 1001, 1010-1012 (7th Cir. 2006).

Medication/Heart Condition

Plaintiff claims that in June 2007, he turned in the sticker tab for a refill on his Mevacor medications, and it was not refilled, despite the fact that the prescription was valid for two more months. (Complaint at 3). Overall, Plaintiff claims he was denied his prescribed medication for six months, and now has an irregular heartbeat as a result. (Complaint at 4). Plaintiff claims he was harmed because in December of 2007, a doctor at Danville told Plaintiff that he had something wrong with his heart. (Plaintiff's Dep at 11).  More specifically, Plaintiff claims that on December 21, 2007, he was given an EKG, which shows he has an irregular heartbeat. (Complaint at 4).

16

As to Kerrick Kiley, Plaintiff believes he wrote a grievance to Kerrick Kiley around December 2007 or January 2008. (Plaintiff's Dep at 18).  Kiley contacted healthcare.  See discussion above regarding the transfer/heart condition.  In his review, Kiley refers to Fueyo's letter, quoting the above language.  (Exhibit E).  Based on this information, Kiley denied the grievance. (Exhibit E).  Kiley is not a medical professional. (Exhibit, Kiley Affidavit). Because Kiley reasonably responded to Plaintiff's grievance by ensuring the inmate has been evaluated by a physician and received medical care for the complained of condition, he is granted summary judgment on this claim.  Johnson v. Doughty, 433 F.3d 1001, 1010-1012 (7th Cir. 2006).

As to David Laker, Plaintiff wrongly believes Laker, as a counselor, reviewed the same grievance as Kiley, sometime around December 2007 or January 2008. (Plaintiff's Dep at 20). However, the counselor that reviewed the January 1, 2008, grievance was David Smetzer. (Exhibit E).  Plaintiff acknowledges there was no other grievance he wrote to Laker concerning his heart condition. (Plaintiff's Dep at 21, 22).  If Plaintiff had submitted a medical grievance to Laker, he would have ensured that Plaintiff had been evaluated by a physician and received medical care for the complained of condition. (Exhibit G, Laker Affidavit). Laker is not a physician, has no medical training, and defers to the decisions of medical professionals.   As Laker had not personal involvement in this claim, he is entitled to summary judgment.

As to Mary Miller, Plaintiff believes Mary Miller changed his dosage of medication sometime in the six month period before December 2007.  (Plaintiff's Dep at 22-24).  However, Miller is not a  licensed physician.  (Exhibit K).   She does not personally fill or deliver prescription medication, and does not have the authority to fill or deliver prescription medications.  (Exhibit K).  Medication prescribed by a doctor is delivered by medical staff, who are employed by Wexford.  (Exhibit K).  Mary affies that she did not alter, change, or deny any prescription medication for inmate Dolis.  (Exhibit K).  Plaintiff has submitted no evidence to show otherwise. Because Miller was not personally involved in any alteration to Plaintiff's prescription, she is entitled to summary judgment.

Furthermore, Ms. Fueyo's memo indicates that Plaintiff was receiving medically appropriate treatment, stating in relevant part, "It appears inmate has been treated in a systematic and timely fashion for hyper lipidemia.  He is currently on medications for his condition and has received proper monitoring of said treatment.  Alterations of the medication regimen are sometimes necessary and it is common to do so.  He has been encouraged to exercise but I see no statements that he will suffer physical harm if not transferred." (Exhibit E). Plaintiff has presented no medical evidence that his medical needs were not being addressed.

As to Keith Anglin, Plaintiff cannot recall whether he sent any grievances he sent to Keith Anglin regarding his heart condition.  (Plaintiff's Dep at 29). The January 1, 2008, grievance was not reviewed by Warden Anglin, but rather by Warden Loftus. (Exhibit E). Plaintiff believes he told Anglin about his heart condition in person, and Anglin said he would get back to him.  (Plaintiff's Dep at 29, 30).  If an inmate had informed Anglin of a serious medical condition, Anglin would have ensured that Plaintiff had been evaluated by a physician and received medical care for the complained of condition. (Exhibit H, Anglin Affidavit)

17

Plaintiff has no evidence that Anglin did not check with medical personnel.  (Plaintiff's Dep at 30).  As there is no evidence in the record to indicate that Anglin had any personal involvement in the plaintiff's claim regarding his medications and alleged resulting heart condition, Anglin is granted summary judgment.

Hearing Loss/Hearing Aid

Plaintiff claims he was fitted for a hearing aid at Chicago Hearing Aid Society, but did not receive it because he  was shipped to IDOC.  (Plaintiff's Dep at 65).  In his response, the Plaintiff claims he has been injured because he "could not hear to get out of the way."  He claims is nose was broken, all his front teeth loosened, both lips severely split and swollen.  He also claims the bones in his nose are now crooked and he cannot breath through his nose freely anymore.  The plaintiff does not provide any documentation to support his allegations and therefore, they cannot be considered.  Because Plaintiff admitted in his deposition that he has not suffered any injury at Danville because of a lack of hearing aid, the court reasonably assumes this alleged assault resulting in injuries occurred at a prison to which he was later transferred.  (Plaintiff's Dep at 66).  Regardless, the defendants were not deliberately indifferent to his concerns.  The defendants followed up with medical regarding his concerns when he filed his grievance.

As to Kiley, Plaintiff claims he complained to Kiley, and Kiley responded to the grievance stating there is nothing in the medical file to show Plaintiff needed a hearing aid.  (Plaintiff's Dep 33 at 66).  The January 1, 2008 group of grievances complains of needing a hearing aid.  (Exhibit E). Director Of Nursing, Terry Fueyo's memo states that "I could find no documentation related to hearing impairment, however, I will have this inmate assessed for need for audiology consult, and if it is determined to be necessary by proper medical personnel, further intervention up to and including hearing aid."  Kiley responded to Plaintiff's grievance on April 4, 2008, and quoted the above language from Fueyo.  Because Kiley ensured that Plaintiff's medical concerns would be addressed by medical personnel, Kiley is entitled to summary judgment.

As to Laker, Plaintiff believes Laker reviewed the grievance and then passed in on to Kiley.  (Plaintiff's Dep at 67).  However, the January 1, 2008 grievance was not reviewed by Laker, but rather Metzer. (Exhibit E).  There is no evidence that Laker reviewed any grievance on this issue.   Therefore, because he had no personal involvement in the plaintiff's claim regarding his hearing loss/hearing aid, Laker is granted summary judgment.

As to Mary Miller, Plaintiff admittedly did not complain to Miller on this issue.  (Plaintiff's Dep at 67).  Because there is no evidence that Miller was ever aware of any medical needs related to a hearing aid, she is entitled to summary judgment.  Further, Plaintiff cannot say that he complained to Anglin on this issue. (Plaintiff's Dep at 67). Because there is no evidence that Anglin was ever aware of any medical needs related to a hearing aid, he is granted to summary judgment.

Gastrointestinal Bleeding

Plaintiff claims he is bleeding from his rectum. (Plaintiff's Dep at 45). Plaintiff claims this condition started in 2004, and gradually got worse. (Plaintiff's Dep at 45, 46). Plaintiff claims that if he sits down on the toilet, the whole toilet is full of blood. (Plaintiff's Dep at 46). Plaintiff also claims that an unidentified doctor advised him that he was ordering that plaintiff undergo an upper GI test to diagnose where the bleeding was occurring. Plaintiff says he did get the upper GI because he was shipped to IDOC. Plaintiff claims, but does not support, that this information is in his Cook County medical record that is in IDOC's possession.

As to Kiley, Plaintiff believes he complained to Kiley in the beginning of 2006. (Plaintiff's Dep 28 at 47). Plaintiff believes Kiley responded to a grievance on this condition in conjunction with responses to the other conditions discussed above. (Plaintiff's Dep at 48). The January 1, 2008 set of grievances complains of gastrointestinal bleeding, and requests a transfer to a less stressful facility (Exhibit E). In response to this grievance, Director of Nursing, Terry Fueyo, wrote a memo dated January 25, 2008. Although Fueyo addressed the transfer, it does not appear that he addressed Plaintiff's concerns about receiving an upper GI to determine where he was bleeding. However that does not mean that Kiley was deliberately indifference to the plaintiff's medical concerns. That is specifically why courts have held prison administrators must rely on those with medical expertise to assess the needs of inmates and to prescribe treatment. *McEahern v. Civiletti*, 502 F. Supp. 531, 534 (N.D. Ill. 1980); *see also Allen v. City of Rockford*, 349 F. 3ed 1015, 1020 (7th Cir. 2003) (Government employees are entitled to rely on a physician's determination of the best way to treat a patient). The only requirement is that the employee reasonably responds to an inmate's complaint of grievance by ensuring the inmate has been evaluated by a physician and received medical care for the complained of condition. *Johnson v. Doughty*, 433 F.3d 1001, 1010-1012 (7th Cir. 2006). Plaintiff agrees he has seen a doctor on this issue around a dozen times. (Plaintiff's Dep at 53). Plaintiff has complained of this condition to doctors for years, and basically the whole time he has been at Danville. (Plaintiff's Dep at 52, 53). Plaintiff claims doctors told him that he would be sent for an upper GI, which was a test to see why he was bleeding. (Plaintiff's Dep at 53). Several times, Plaintiff was actually tested by doctors. (Plaintiff's Dep at 54). Plaintiff explains that the doctors gave him cards, and put his blood on there, and then put on some kind of dye to determine if its blood. (Plaintiff's Dep at 54). It appears Plaintiff's claim is that he is unhappy with the treatment he was receiving from the doctors. However, although a prisoner has the right to receive medical care, he does not have the right to determine the type and scope of care he personally desires. *Coppinger v. Townsend*, 398 F.2d 392, 394 (10th Cir. 1968), *citing, Lawrence v. Ragen,* 323 F.2d 410, 412 (7th Cir. 1963). Furthermore, Kiley is not a licensed physician. (Exhibit K). It is clear that Plaintiff was seen by doctors regarding this condition regularly, and at least "a dozen" times. Therefore Kiley is granted summary judgment on this claim. For the same reason, Miller is granted summary judgment on this claim.

Plaintiff cannot identify a specific grievance the he wrote to Laker concerning his gastrointestinal bleeding. (Plaintiff's Dep at 49). The grievance reviewed by Kiley on this issue

was not reviewed by Laker, but rather counselor Metzer. (Exhibit E).  As Laker had no personal involvement in this incident, he is granted summary judgment.

As to Anglin, Plaintiff's claim against Anglin is that he reviewed grievances.  (Plaintiff's Dep at 55).  However, Plaintiff cannot identify any grievances that Anglin reviewed on this issue.
(Plaintiff's Dep at 56).  Furthermore, Plaintiff admits that does not think Anglin reviewed any grievances on this issue before this complaint was filed. (Plaintiff's Dep at 58).  The January 1, 2008 grievances were not reviewed by Warden Anglin, but rather by Warden Loftus. (Exhibit E).  As Anglin had no person involvement in this incident, he is granted summary judgment.

Urethra Stricture

Plaintiff claims he has a urethra stricture for which he previously had a surgery that was only temporarily successful due to a large amount of scar tissue. (Complaint at 4).  Plaintiff claims he cannot urinate, and that urine just drips out of him. (Plaintiff's Dep at 31).  Plaintiff claims he needs treatment or surgery. (Complaint at 5).

As to the defendant  Kiley, Plaintiff claims he wrote "a bunch" of grievances on various issues, and Kiley consolidated the answers and gave an answer for a bunch of them. (Plaintiff's Dep at 35).  Plaintiff believe he received a response to his grievance about his urethra at the same time he received a response to the grievance on his heart condition. (Plaintiff's Dep at 35).  Plaintiff believes Kiley responded to multiple grievances at once, discussing Plaintiff's heart condition and urethra problem. (Plaintiff's Dep at 36).  It appears that Plaintiff is referring to the January 1, 2008 grievance, which Kiley reviewed on April 4, 2008.  (Exhibit E).  The Director of Nursing, Terry Fueyo's memo dated January 25, 2008, states in relevant part that "I see no order to refer inmate to a urologist.  Inmate has had evaluation for urinary problems onsite and I see no evidence that MD has indicated the need for or ordered further workups."  (Exhibit E).  In his review, Kiley refers to Fueyo's letter, quoting the above language. (Exhibit E).  Based on this information, Kiley denied the grievance. (Exhibit E).  Furthermore, Plaintiff acknowledges that during his time at Danville he has been seen by a doctor for his urinary problem.  (Plaintiff's Dep at 39). Plaintiff was seen by a doctor in February or March of 2006.  (Plaintiff's Dep at 39).  On a separate visit, around the beginning of 2006, Plaintiff saw a doctor who was going to do a test by using a Foley catheter.  (Plaintiff's Dep at 39).  Plaintiff acknowledges he saw a doctor three times in the beginning of 2006.  (Plaintiff's Dep at 40).  Plaintiff would see a doctor for other issues and complain about his urethra problems. (Plaintiff's Dep at 41).  Plaintiff discussed this issue with doctors around ten or twelve times while at Danville. (Plaintiff's Dep at 41). Because Kiley reasonably responded to Plaintiff's grievance by ensuring the inmate has been evaluated by a physician and received medical care for the complained of condition, he is granted summary judgment.  *Johnson v. Doughty*, 433 F.3d 1001, 1010-1012 (7th Cir. 2006).

As to the defendant Laker, Plaintiff believes the grievance on his urinary problems would have gone to Laker, and then to Kiley. (Plaintiff's Dep at 36).  However, the January 1, 2008,

grievance that Kiley responded to, was reviewed by David Metzer.  (Exhibit E).  There is no evidence that Defendant Laker reviewed this grievance.  As Laker had no personal involvement in this incident he is granted summary judgment.

As to Miller, Plaintiff claims he spoke to Mary Miller several times about his urethra condition, and she said he would be treated.  (Plaintiff's Dep at 38). Plaintiff believes he spoke with Miller within the first six months after he arrived at Danville, between February and July 2006.  (Plaintiff's Dep at 38, 39).  Plaintiff acknowledges that during his time at Danville he has been seen by a doctor for his urinary problem.  (Plaintiff's Dep at 39). Plaintiff was seen by a doctor in February or March of 2006.  (Plaintiff's Dep at 39).  On a separate visit, around the beginning of 2006, Plaintiff saw a doctor who was going to do a test by using a Foley catheter.  (Plaintiff's Dep at 39).  Plaintiff acknowledges he saw a doctor three times in the beginning of 2006.  (Plaintiff's Dep at 40).  Plaintiff would see a doctor for other issues and complain about his urethra problems.  (Plaintiff's Dep at 41).  Plaintiff discussed this issue with doctors around ten or twelve times while at Danville. (Plaintiff's Dep at 41). Furthermore, the Director of Nursing, Terry Fueyo's memo dated January 25, 2008, states in relevant part that "I see no order to refer inmate to a urologist. Inmate has had evaluation for urinary problems onsite and I see no evidence that MD has indicated the need for or ordered further workups." (Exhibit E). Mary Miller is not a doctor, and does not provide treatment to inmates.  It is clear that Plaintiff was seeing medical personnel during the timeframe of his complaint.  It appears that his claim is just that he is unhappy with the course of action taken by the doctors he saw.  However, this is not enough to succeed on a claim of deliberate indifference against Miller.  Because Miller ensured that Plaintiff had been evaluated by a physician and received medical care for the complained of condition, she is granted summary judgment.  *Johnson v. Doughty*, 433 F.3d 1001, 1010-1012 (7th Cir. 2006).

As to Anglin, Plaintiff believes he probably complained to Anglin about this issue in 2008, but cannot identify any grievance Anglin responded to on this issue.  (Plaintiff's Dep at 45).  Plaintiff cannot remember telling Anglin about his urethra condition.  (Plaintiff's Dep at 44).  The January 1, 2008 grievance (Exhibit E) was not reviewed by Warden Anglin, but rather by Joseph Loftus.  Plaintiff agrees Anglin probably didn't respond to any grievances on this issue.  (Plaintiff's Dep at 45).  As Plaintiff has no evidence that Anglin was aware of this issue, the court finds Anglin had no personal involvement in this incident he is therefore granted summary judgment.

Because Defendant Walker was not personally involved in any of Plaintiff's medical complaint, he is also granted summary judgement.  Defendants in a suit brought pursuant to 42 U.S.C. §1983 can only be held liable for their own individual wrongdoing.  *Duckworth v. Franzen*, 780 F.2d 645, 650 (7th Cir. 1985).  An individual satisfies this personal responsibility requirement if he fails to act with a deliberate or reckless disregard of the plaintiff's constitutional rights or if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent.  *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982).  Plaintiff never personally spoke to director Walker, and has no evidence that Director

Walker ever reviewed his grievances.  (Plaintiff's Dep at 9, 10). During his tenure as Director, Roger Walker did not receive, review, or respond to offender grievances or grievance related correspondence.  The Administrative Review Board assists the Director by reviewing inmate grievances.  (Exhibit J, Johnson Affidavit).  Director Walker would not personally sign responses to grievances.  He had a designee that would sign for him.  (Exhibit J, Johnson Affidavit). Because Defendant Walker was never aware of any of Plaintiff's alleged medical conditions, he is granted summary judgment.

Equal Protection Claim

Finally, the court finds the defendants are also entitled to summary judgment on Plaintiff's equal protection claim.   A person bringing an action under the Equal Protection Clause must show intentional discrimination against him because of his membership in a particular class, not merely that he was treated unfairly as an individual.  *Huebschen v. Department of Health and Social Services*, 716 F.2d 1167, 1171 (7th Cir. 1983).  When there is no evidence of discriminatory conduct, summary judgment on an equal protection claim should be granted.  *Wilson v. Schomig*, 863 F.Supp 789, 794 (ND IL 1994) (The Court granted the defendant's motion for summary judgment on an equal protection claim because there was no evidence of any racially discriminatory conduct by defendant when assigning an inmate to a prison job).  In this case, Plaintiff claims his equal protection rights were violated because he was
denied a transfer, even though "other guys with bad disciplinary records" were transferred. (Plaintiff's Dep at 83).  When asked at his deposition to explain this claim, Plaintiff stated "I was denied a transfer even though other guys with bad disciplinary records, very violent kind where people are hurt, were transferred.  I believe that was in retaliation for maybe filing grievances all the time. (Plaintiff's Dep at 83).  However, Plaintiff's claim in this lawsuit is one of equal protection, not retaliation.  Plaintiff cannot say how not being transferred is a violation of his equal protection rights.  (Plaintiff's Dep at 88).  In reality, Plaintiff's request for a transfer to Centralia Correctional Center was denied because of bed space needs and additional observation was needed. (Exhibit D).  He knew that prior to bringing this lawsuit.  Furthermore, Plaintiff has no evidence that any Defendant made the decision not to transfer Plaintiff.  Plaintiff agrees that Kiley, Laker, Miller have nothing to do with this claim.  (Plaintiff's Dep at 86, 87).  In fact, from the record it appears that the only person involved in the denial of Plaintiff's transfer was Counselor Metszer, not a defendant.  So why did Plaintiff file this claim against Kiley, Laker, Miller?  Just because he could?  It was frivolous for him to do so.  Defendants are granted summary judgment in this case because Plaintiff has no evidence of intentional discrimination against him because of his membership in a particular class.

The plaintiff is advised that 730 ILCS 5/3-6-3(d) provides that "[i]f a lawsuit is filed by a

prisoner in an Illinois or federal court against the State, the Department of Corrections, or the Prisoner Review Board, or against any of their officers or employees, and the court makes a specific finding that a pleading, motion, or other paper filed by the prisoner is frivolous, the Department of Corrections shall conduct a hearing to revoke up to 180 days of good conduct

credit by bringing charges against the prisoner sought to be deprived of the good conduct credits before the Prisoner Review Board as provided in subparagraph (a)(8) of Section 3-3-2 of this Code.  If the prisoner has not accumulated 180 days of good conduct credit at the time of the finding, then the Prisoner Review Board may revoke all good conduct credit accumulated by the prisoner.  Plaintiff should think twice before bringing frivolous claims against state employees.

Furthermore, Plaintiff's claim that he is being unconstitutionally housed with another inmate in a single man cell fails to state a constitutional claim.  Further, his claim that he is housed 22 hours a day fails to state a constitutional claim because he has alleged no harm.   The court notes that it inadvertently failed to dismiss these claims at the merit review conference.  The defendants are granted summary judgment on these claims.

It is therefore ordered:

1.      Pursuant to 42 U.S.C. § 1997e(a), Plaintiff's soy claim against all the defendants in this case is dismissed, without prejudice, for failure to exhaust administrative remedies prior to filing his lawsuit.  *See Perez v. Wisconsin Department of Corrections*, 182 F.3d 532, 535 (7th Cir. 1999).

2.      Pursuant to Fed. R. Civ. Pro. Rule 56(c), the defendants,  Roger Walker, Jr., Kerrick Kiley, David Laker, Mary Miller and Keith Anglin's summary judgment motion [75] is granted, with the exception that Plaintiff's soy claim is dismissed, without prejudice, as noted above.  The clerk of the court is directed to enter judgment in favor of the defendants, Roger Walker, Jr., Kerrick Kiley, David Laker, Mary Miller and Keith Anglin and against the plaintiff at the close of this case.   The clerk of the court is directed to terminate the defendants, Walker, Kiley, Laker, Miller and Anglin, forthwith.

3.      If the plaintiff wishes to appeal this dismissal, he must file a notice of appeal with this court within 30 days of the entry of judgment.  Fed. R. App. P. 4(a)(4).  A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal.  *See* Fed. R. App. P. 24(a)(1)(C).  If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal.  Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a strike under 28 U.S.C. 1915(g).

Enter this 20th     day of September 2010.

**\s\Harold A. Baker**

_____

Harold A. Baker
United States District Judge

23