E-FILED
Thursday, 17 March, 2011 10:03:12 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

James Dolis,

        Plaintiff,

v.                                                                                       08-cv-2085

Joseph L. Loftus, et al.,

        Defendants

MEMORANDUM OPINION AND ORDER

     Before the court are Dr. Bashir Ameji and Wexford Health Sources, Inc.'s summary judgment motion [78] and the Plaintiff's response [107]

Standard

     Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

     "Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2000). "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(c). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e). Further, "[t]he plaintiff cannot merely allege the existence of a factual dispute to defeat summary judgment …. Instead, he must supply evidence sufficient to allow a jury to render a verdict in his favor." *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001). Specifically, the non-moving party "must present sufficient

evidence to show the existence of each element of its case on which it will bear the burden at trial." *Filipovic v. K&R Express Systems, Inc*., 176 F.3d 390, 390 (7th Cir. 1999). Failure by the non-movant to meet all of the above requirements subjects him to summary judgment on his claims.

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659. It is also well settled that "conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment. Keri v. Barod of Trustees of Purdue University, 458 F.3d 620, 628 (7th Cir.2006)(*citing Haywood v. N. Am. Van Lines, Inc.,* 121 F.3d 1066, 1071 (7th Cir.1997).

Background

Plaintiff, James Dolis, is an inmate presently incarcerated within the Illinois Department of Corrections. Plaintiff brings a several complaints regarding the medical care he received while incarcerated at the Danville Correctional Center. Other Defendants were granted summary judgment in a separate order. The Defendants' motion addresses Plaintiff's complaints regarding Dr. Ameji and Wexford Health Sources, Inc. Plaintiff set out five distinct claims that are labeled A-E in the Complaint.

A. Plaintiff complains that Co-Defendant Mary Miller did not provide medication prescribed to him by Dr. Ameji. Plaintiff also complains that he is not given enough time to exercise and wanted to be transferred. As the plaintiff did not allege any involvement by Dr. Ameji or Wexford for this claim, the court finds this claim is not a claim against Dr. Ameji or Wexford.
B. Plaintiff complains of the treatment provided to him for what he alleges was a stricture in his urethra.
C. Plaintiff complains of lower gastro-intestinal problems.
D. Plaintiff complains of issues with his dental care. Plaintiff admitted in his deposition that Dr. Ameji is not involved in Plaintiff's allegations regarding his dental care.
E. Plaintiff complains of hearing loss.
F. Plaintiff complains of soy in his diet.
G. Plaintiff alleges he suffered violation of his equal protection rights by not being transferred from the Danville Correctional Center.

Plaintiff complains that while incarcerated at the Danville Correctional Center the Defendants, Dr. Ameji and Wexford violated his federal constitutional rights. The Defendants

2

advise the court that Plaintiff admits that he does not have any evidence that policy or procedure of Wexford Health Sources affected his treatment in any way.  Further, Defendants assert that the evidence contained in the undisputed medical records clearly indicates the Plaintiff received appropriate treatment for all medical complaints he brought to the attention of Dr. Ameji.  Last, Defendants assert that neither Dr. Ameji nor Wexford have the authority to change Plaintiff's diet or transfer him to another facility within IDOC.  Defendants assert that there is no material fact in dispute in this matter and summary judgment is proper.

Undisputed Material Facts[1]

1. Plaintiff is an inmate incarcerated in the Illinois Department of Corrections. (Plaintiff's Amended Complaint.)
2. Plaintiff's complaint references only persons employed at the Danville Correctional Center.
3. Plaintiff was incarcerated at the Danville Correctional Center from February 15, 2006 to August 5, 2008. (Exhibit 1, p. 91.)
4. Plaintiff was treated by Dr. Ameji only while at the Danville Correctional Center. (Exhibit 1, p. 91.)
5. Plaintiff has never been diagnosed by Dr. Ameji during the relevant time frame with a heart problem. (Exhibit 1, p. 95.)
6. The entire time Plaintiff was at Danville Correctional Center under the care of Dr. Ameji he was provided cholesterol medication. (Exhibit 1, p. 96.)
7. Dr. Ameji is not involved in Part A of Plaintiff's Amended Complaint. (Exhibit 1, p. 97.)
8. Wexford is not mentioned at all in Part A of Plaintiff's Complaint. (Complaint, Paragraph A.)
9. Plaintiff does not have any evidence that Wexford's policies or procedures affected his medical treatment while he was incarcerated at the Danville Correctional Center. (Exhibit 1, p.99-100.)
10. No doctor has ever related Plaintiff's alleged cysts or boils to his urethra stricture. (Exhibit 1, p. 101-102.)
11. Plaintiff has no evidence that Wexford maintains a policy or procedure to deny him medical treatment. (Exhibit 1, p. 104.)
12. Plaintiff has never been told by a doctor that he needs his upper gastrointestinal tract examined. (Exhibit 1, p. 109.)
13. Plaintiff received a colonoscopy while at the Illinois River Correctional Center. (Exhibit 1, p. 107.)
14. Plaintiff's colonoscopy revealed no problems with his intestines. (Exhibit 1, p. 107.)
15. Plaintiff has received two lower gastrointestinal exams.  (Exhibit 1, p. 107).
16. Dr. Ameji is not involved in Plaintiff's allegations regarding his dental care. (Exhibit 1,

---

[1] The exhibits can be found attached to Defendants' Summary Judgment Motion [78] and Dr. Ameji's executed affidavit [82].  Plaintiff has attached several exhibits but do not point to any in his response, except his deposition.  Further, Plaintiff disputes several facts, but does not support his his disputes with any documents or affidavits.  Further, when he denies facts they are mostly in the form of an argument.

p. 112.)
17. Plaintiff was seen by a dentist at the Danville Correctional Center. (Exhibit 1, p. 112.)
18. Plaintiff does not suffer any pain from the alleged cavities in his teeth. (Exhibit 1, p. 113.)
19. Plaintiff is currently on the list to have his cavities filled. (Exhibit 1, p. 113.)
20. Plaintiff admits that he bears responsibility for the fact that he has not seen a dentist at Illinois River Correctional Center due to his numerous court writs. (Exhibit 1, p. 114.)
21. Plaintiff has no physical injury from his alleged dental complaints. (Exhibit 1, p. 115.)
22. Plaintiff has no evidence that Wexford has a policy or practice to deny him dental care. (Exhibit 1, p. 115.)
23. No doctor at IDOC has diagnosed the plaintiff with hearing problems. (Exhibit 1, p. 116.)
24. Plaintiff is capable of having conversations. (Exhibit 1, p. 117.)
25. Plaintiff only has difficult with background noise. (Exhibit 1, p. 117.)
26. Plaintiff has no evidence that Wexford has a policy to deny him a hearing aid. (Exhibit 1, p. 118.)
27. Plaintiff has no evidence that Wexford has authority to keep soy out of the diet provided to him by IDOC. (Exhibit 1, p. 119.)
28. Plaintiff has not been diagnosed with a soy allergy. (Exhibit 1, p. 120.)
29. No doctor has ever told Plaintiff that soy is making him sick. (Exhibit 1, p. 120.)
30. Plaintiff has no medical evidence that soy in his diet is causing his alleged rectal bleeding. (Exhibit 1, p. 125.)
31. Plaintiff has no medical evidence that soy is causing his alleged throat problems. (Exhibit 1, p. 126.)
32. Plaintiff has no medical evidence that soy is causing his cholesterol problems. (Exhibit 1, p. 126.)
33. Plaintiff has no evidence that any Wexford policy prevented him from being transferred from the Danville Correctional Center. (Exhibit 1, p. 129.)
34. Plaintiff admits Dr. Ameji ordered him to receive more time for exercise. (Exhibit 1, p. 130.)
35. Plaintiff has no evidence that Dr. Ameji had the authority to have him transferred from the Danville Correctional Center. (Exhibit 1, p. 133.)
36. Plaintiff has no evidence that Wexford has the authority to have him transferred from the Danville Correctional Center. (Exhibit 1, p. 133.)
37. No doctor has been able to resolve plaintiff's alleged rectal bleeding problems. (Exhibit 1, p. 134.)
38. Dr. Ameji was the medical director at the Danville Correctional Center when the Plaintiff, James Dolis, was incarcerated there in April, 2006. (Exhibit 2, Par. 1.)
39. Dr. Ameji retired from employment at the Danville Correctional Center in February, 2009. (Exhibit 2, Par. 2.)
40. Attached to Dr. Ameji's affidavit are the relevant medical records relied upon when he provided care to Mr. Dolis. He also relied upon these records in making his affidavit. These records were kept in the ordinary course of business at the Illinois Department of Corrections. (Exhibit 2, Par. 3.)
41. The medical records state that Mr. Dolis was transferred to the Danville Correctional

4

Center on February 15, 2006. (Exhibit 2, Par. 4, and Exhibit 3.)
42. According to the medical records, on February 18, 2006 the Plaintiff was seen by a registered nurse in regards to the refill of his medications. The Plaintiff was referred to the M.D. for review and reorder of his medications. (Exhibit 2, Par. 5, and Exhibit 4.)
43. On February 19 it is noted in the medical records that the Plaintiff was rescheduled for the medical doctor call line due to a Level 1 lock down. (Exhibit 2, Par. 6, and Exhibit 5.)
44. On March 25, 2006 the Plaintiff was seen by Dr. Obaisi. During that visit the Plaintiff was requesting a low back, low gallery pass due to complaints of chronic back and shoulder pain. The Plaintiff reports that a CT scan in January 2005 revealed bulging discs. The Plaintiff also requests Indocin for the pain. Vital signs: Stable. According to the records Dr. Obaisi performed a physical examination of the Plaintiff's lower back and came to the assessment of chronic back pain. As a result, Dr. Obaisi ordered the Plaintiff to be on a low bunk, low gallery, avoid heavy lifting, provided Indocin for the pain, explained the effects of long term usage of non-steroidal anti-inflammatory drugs, and admitted the Plaintiff to the general clinic line. (Exhibit 2, Par. 7, and Exhibit 6.)
45. Dr. Ameji had his first visit with the Plaintiff on April 7, 2006. His note from that date states as follows:
> Lab report of urinalysis shows white blood count 10-15.
> White blood count and esterase.
> Assessment: Urinary tract infection.
> Plan: 1) Septra twice a day for 10 days. 2) Drink 10 glasses of water daily.

(Exhibit 2, Par. 8, and Exhibit 7.)
46. On this date the lab results from the Plaintiff's complaints of urinary problems have been received. Dr. Ameji reviewed the lab results which revealed the Plaintiff was suffering from a urinary tract infection. As a result Dr. Ameji provided the Plaintiff with an antibiotic and instructed him to drink 10 glasses of water every day in order to flush out the infection. (Exhibit 2, Par. 9.)
47. Dr. Ameji followed up with the Plaintiff on April 12, 2006. His note from that date states as follows:
> Subjective: Results of lipids/cholesterol tests from 3/30/2006 – Cholesterol: 224 (100-199 is normal). Triglycerides: 236 (0-149 is normal). HDL: 27 (40-59 is normal). LDL: 150 (0-99 is normal).
> Assessment: Hyperlipidemia.
> Plan: Low cholesterol, low salt diet. He is already on Mevacor 80 mg.

(Exhibit 2, Par. 10, and Exhibit 8.)
48. On this date Dr. Ameji reviewed with the Plaintiff the result of his cholesterol test. As the result of these tests Dr. Ameji came to the assessment the Plaintiff had suffered from hyperlipidemia, or high cholesterol. As a result he put the Plaintiff on a low cholesterol, low salt diet and noted that he was already on Mevacor, which is a cholesterol reducing medication. (Exhibit 2, Par. 11.)
49. Dr. Ameji next saw the Plaintiff on July 5, 2006. His note from that date states as follows:
> 44-year-old white male. 5'11" tall. 192 pounds. He wants an Indocin refill for back pain. He wants a lipid panel.

5

    Objective: Back pain. Full range of motion.
    Assessment: Low back pain.
    Plan: 1) Lipid panel. 2) Indocin 25 mg x90 days.
  (Exhibit 2, Par. 12, and Exhibit 9.)

50. Dr. Ameji followed up with the Plaintiff on September 21, 2006 in regards to his cholesterol. Dr. Ameji's note from that date states as follows:
    Subjective: 45-year-old white male. 5'11" tall. Weight: 190 pounds. Reports having lost 30 pounds.
    Objective: Lungs and heart within normal limits.
    Assessment: Cholesterol high/hyperlipidemia. LDL elevated. HDL low.
    Plan: Low cholesterol, high protein diet for 12 months.
  (Exhibit 2, Par. 13, and Exhibit 10.)
On this date Dr. Ameji reviewed the Plaintiff's latest results which revealed the Plaintiff was still suffering from hyperlipidemia. As a result Dr. Ameji continued the Plaintiff on his low cholesterol medication, and put him on a high protein diet for 12 months. Additionally, he placed the Plaintiff on Mevacor 80 mg daily; enteric coated aspirin 325 mg daily; and Indocin 50 mg twice a day. He also educated the Plaintiff on a low cholesterol diet, and educated him as to exercise and to get his exercise in the form of taking long walks. Finally Dr. Ameji instructed the Plaintiff to follow up with him in five months. (Exhibit 2, Par. 13, and Exhibits 11 and 12.)

51. Dr. Ameji followed up with the Plaintiff on December 28, 2006. His note from that date states as follows:
    The Plaintiff was seen in the hypertension chronic care clinic. The Plaintiff's cholesterol levels were reviewed. Cholesterol was 274; LDL 216. The Plaintiff's medication of Mevacor 80 mg daily was continued for six months. Niacin 500 mg was continued for six months. Indocin 50 mg continued for six months. Enteric coated aspirin 325 mg continued for six months. The Plaintiff educated on a low cholesterol and low fat diet. Educated on taking medications regularly. Educated on the importance of exercise.
  (Exhibit 2, Par. 14, and Exhibit 13.)

52. On this date Dr. Ameji saw the Plaintiff on his regularly scheduled chronic care clinic due to his high cholesterol. The Plaintiff's cholesterol levels remain high. As such, Dr. Ameji continued the Plaintiff's Mevacor cholesterol medication; as well as Niacin, and enteric coated aspirin. Additionally he continued the Plaintiff's Indocin, which is a pain reliever for his low back. The Plaintiff was educated on remaining on his low cholesterol, low fat diet, as well as properly taking his medication. The Plaintiff also was educated on the importance of exercise. (Exhibit 2, Par. 15.)

53. Dr. Ameji next saw the Plaintiff on April 24, 2007. His note states as follows:
    Subjective: He is evaluated for hyperlipidemia. I gave him Niacin XL 50 mg x6 months. Lopid 600 mg x6 months. Enteric coated aspirin 325 mg a day x1 year. Plan: 1) A comprehensive medical profile is to be done. 2) A lipid profile to be done. Plaintiff to be provided a multivitamin with iron to take daily for 90 days. As well as a midstream urinalysis to be performed.
  (Exhibit 2, Par. 16, and Exhibit 14.)

6

54. Dr. Ameji further noted that the Plaintiff was seen in the chronic care clinic on that same date, 4/24/2007. His note from that date states that he educated the Plaintiff on taking his medications regularly. Dr. Ameji also educated him as to the importance of exercising regularly and to exercise a lot. He continued Plaintiff's medications of Indocin, niacin, Mevacor, Lopid, as well as enteric coated aspirin. Dr. Ameji ordered the Plaintiff to follow up in five months. (Exhibit 2, Par. 17, and Exhibit 15.)
55. The Plaintiff followed up with Dr. Ameji as ordered on August 22, 2007. His note from that date states as follows:
> Subjective: 45-year-old male. 5'11" tall. Weight: 190 pounds.
> Cholesterol test of 8/16/2007 reveals cholesterol to be 338 (normal is 100-200). Triglycerides: 70 (normal is 45-150). LDL: 299, elevated (normal is 25-120).
> Assessment: Increase in LDL and cholesterol.
> Plan: Continue enteric coated aspirin 325 mg for five more months. Indocin 50 mg. Niacin 500 mg, continued. Lovastatin x5 months.

(Exhibit 2, Par. 18, and Exhibit 16.)
56. On this date Dr. Ameji again reviewed the Plaintiff's cholesterol levels in monitoring his high cholesterol. The Plaintiff continued to have high cholesterol as well as high LDL. As a result Dr. Ameji continued the Plaintiff on his enteric coated aspirin, niacin, and the pain reliever Indocin. However, he changed the Plaintiff to Lovastatin as his cholesterol lowering medication in an attempt to see if it worked, giving more favorable results than the Mevacor. (Exhibit 2, Par. 19.)
57. On the same date, August 22, 2007, Dr. Ameji filled out a chronic care clinic form for the Plaintiff. He noted the Plaintiff was suffering from hypertension and hyperlipidemia, as well as he noted the Plaintiff's cholesterol, LDL and triglyceride levels. He educated the Plaintiff on proper diet of low cholesterol, low fat food, as well as noted that the Plaintiff's medications were continued including Lopid 60 mg. (Exhibit 2, Par. 20, and Exhibit 17.)
58. Dr. Ameji again saw the Plaintiff on August 28, 2007. His note states:
> Subjective: He wants his Lovastatin 20 mg raised to 80 mg. He is on Lopid 600 mg twice a day; niacin XL 500 mg twice a day; and I put him on Lovastatin 20 mg. He is on too many dyslipidemia medications. Let us remain with Lovastatin 20 mg; and will proceed with lipid profile prior to next visit.

(Exhibit 2, Par. 21, and Exhibit 18.)
59. On this date the Plaintiff was requesting an increase of his cholesterol medication. However, Dr. Ameji reviewed the Plaintiff's medication and came to the conclusion that he is probably on too many dyslipidemia, or cholesterol medications, and did not think that an increase in his Lovastatin was indicated at this time. Dr. Ameji informed the Plaintiff that they would revisit this issue after his next cholesterol test. (Exhibit 2, Par. 22.)
60. October 3, 2007. Medical special services referral and report. Referred to Carle – void cystogram. Rationale for referral: The Plaintiff had previous surgery, possible dilation of urethral stricture. Now complaining of voiding problems. The report of referral, Dr. Funk consulted on collegial review 10/3/2007. Dr. Funk advised to first pass catheter and establish stricture and residual urine and then see about stricture. (Exhibit 2, Par. 23, and Exhibit 29.)

61. Dr. Ameji also noted from that collegial review with Dr. Funk, he recommended to pass catheter and establish stricture and residual urine in bladder. If diagnosis of stricture was established after passing catheter and residual urine, resubmit for approval of procedure. Basically, do diagnostic catheterization. (Exhibit 2, Par. 24, and Exhibit 30.)
62. Dr. Ameji had a collegial review regarding the Plaintiff on October 31, 2007[2]. His note states as follows:
    > M.D. note (collegial) discussed with Dr. Funk and Robin on collegial review. Explained to Funk the Plaintiff had previous procedure of urethra stricture. Dr. Obaisi was able to catheterize him. P.A. Sallah saw him on April 1, 2006. Dr. Funk recommended to catheterize the patient to see the stricture and if could pass the catheter easily the stricture is not of much significance. Also see if there is any residual urine produced by the catheter. I would proceed with catheterization at that time. Voiding cystogram is on hold. I will catheterize at the institution. The patient has not denied any procedures or catheterizations.
    
    (Exhibit 2, Par. 25, and Exhibits 19 and 20.)
63. On this date Dr. Ameji had a collegial review with Dr. Funk in regards to the Plaintiff's complaint of a urethral stricture. As a result of the collegial review, they came to the conclusion that attempting to pass a catheter would be the next step in diagnosis whether the Plaintiff has a stricture. (Exhibit 2, Par. 26.)
64. On October 18, 2007 Dr. Ameji saw the patient in the presence of Nurse Kathy Buchanan. His notes state as follow:
    > Consent to pass the catheter into the penis and urethra taken. Procedure explained. He says "I want a urologist to pass the catheter". I told him I have catheterized hundreds of patients in my life. He signed the consent.
    
    Exhibit 2, Par. 27, and Exhibit 21.)
65. Dr. Ameji's note continues:
    > He says I will file papers and I want you to see all my previous records, etc., etc. He wanted me to see what the Menard doctor did not do. He also wanted me to see what Mary Miller did not do. Kathy Buchanan, nurse, present at all times. Set up for catheter was done by Kathy Buchanan. Sterile precautions taken. Catheter passed easily. He says my stricture, I know where it is, etc., etc. Procedure done.
    
    (Exhibit 2, Par. 28, and Exhibit 22.)
66. On this date Dr. Ameji performed a catheterization of the Plaintiff following his consent. The catheter passed easily and Dr. Ameji did not encounter any stricture that obstructed the urethra. The fact that the catheter passed easily into the urethra indicates the Plaintiff

---

[2]Plaintiff disputes fact number 62 by saying Dr. Ameji had a collegial review on October 31, 2007 [regarding the catherization], but the catherization took place on October 18, 2007 and "how is this possible. The court notes that in Fact number 60, Dr. Ameji says the collegial review took place on October 3, 2007, but in fact number 64, he says October 31, 2007. The court reasonably assumes that the second date is a typographical and the collegial review took place on October 3, 2007. Even if the collegial review did not take place, the fact is a catherization was performed on the Plaintiff.

was not suffering from a severe stricture. (Exhibit 2, Par. 29.)

67. Dr. Ameji, had my LPN, Kathy Buchanan, note her experience with the Plaintiff on October 18, 2007 as well. Ms. Buchanan's note from that date states as follows:
    LPN note: MDSC
    Subjective: "You didn't put that catheter in all the way. I know you didn't because I know my stricture." I told you "Mary Miller" was supposed to order a special catheter. She told me she would order it. You're going to hear about this (telling Dr. Ameji) I know what I have to do."
    Objective: Prior to procedure nurse took inmate's vitals in exam room. Temp: 96.3 degrees. Blood pressure: 116/80. Pulse: 72. Oxygen saturation: 97%. Weight: 186. Alert and oriented x3. Talkative. "Did Mary Miller get the special catheter she told me she would?". Nurse explained to inmate she was unaware of such an order. Nurse then excused inmate to wait in waiting room and she would talk to Mary's assistant, Kim. Kim explained that there was no such order. Nurse then went to ER where she got sterile field ready for Dr. Ameji. Nurse then called inmate into ER with Dr. Ameji. With sterile procedure in place Dr. Ameji inserted a 16" F 30cc catheter after inmate signed a "consent form" for procedure. Dr. Ameji had no trouble whatsoever inserting the catheter. Catheter was approximately 12 inches in length and was inserted approximately 7½ to 8 inches. No urine was voided. Inmate then became loud and threatening Dr. Ameji that "you will hear from me, this isn't over. I'll have a lawsuit against you." Dr. Ameji remained calm and had inmate return to his housing unit after trying to explain that the procedure was done in the best of his interest, and done as ordered.
    Assessment: Altered comfort related to catheter.
    (Exhibit 2, Par. 30, and Exhibits 23, 24, and 25.)

68. The next visit Dr. Ameji had with the Plaintiff was December 10, 2007. On that date he noted that the Plaintiff had been seen by P.A., Mo Sallah, on December 9, 2007. The Plaintiff had been put on Mevacor 80 mg, niacin 500 mg; and enteric coated aspirin 325 mg. Dr. Ameji also noted the Plaintiff's lab results from the test performed on December 7, 2007 revealed the Plaintiff's cholesterol was 354, which was above the normal range of 100-200. The Plaintiff's triglycerides were 172, which are above the normal range of 45-150. The Plaintiff's HDL was 28; and his LDL was 292, which are elevated. Dr. Ameji reviewed the medications and agreed with the assessment of Mo Sallah to put the Plaintiff on Mevacor, niacin, and enteric coated aspirin. (Exhibit 2, Par. 31, and Exhibit 26.)

69. Dr. Ameji next visited with the Plaintiff on December 19, 2007. His note states as follows:
    Subjective: He wants more time to exercise. He says Major Reardon sent him.
    Objective: Anxiety.
    Assessment: He can be transferred if Major Reardon wants.
    Exhibit 2, par. 32, and Exhibit 27.)

70. On this date, the Plaintiff was requesting more time to exercise than what is allowed at the Danville Correctional Center. Dr. Ameji informed him that he had no power to transfer Plaintiff to a lower security facility, and Dr. Ameji noted that if Major Reardon wanted the Plaintiff to be transferred, Dr. Ameji had no medical reason for denying a transfer.

9

(Exhibit 2, Par. 33.)

71. Dr. Ameji's next visit with the Plaintiff was January 8, 2008. On that date Deputy Warden Anglin asked Dr. Ameji to review a letter the Plaintiff had written to the deputy warden. The inmate was requesting to be transferred to a minimum security unit. (Exhibit 2, Par. 34, and Exhibit 28.)

72. On this date Dr. Ameji reviewed a letter the Plaintiff had sent to the deputy warden requesting a transfer to the minimum security unit. Dr. Ameji informed the warden that he did not have the authority to transfer the Plaintiff. If the Plaintiff wanted to be transferred or could be transferred, it would be a security issue for them to decide. (Exhibit 2, Par. 35.)

73. Following receipt of the letter from the Deputy Warden, Dr. Ameji performed a chart review of the Plaintiff's medical records. His note states as follows:
> Chart review: Inmate not seen. His EKGs are normal. I do not see anywhere that he has a bad heart. He has hyperlipidemia and dyslipidemia for which he is given medications. He is getting medications: 1) Mevacor. 2) Niacin. 3) Enteric coated aspirin. He needs to do lots and lots of exercise daily to burn lipids. (Exhibit 2, Par. 36, and Exhibit 31.)

74. Dr. Ameji's next visit with the Plaintiff was January 28, 2008. On that date the Plaintiff reported the following:
> He wants me to tell Deputy Warden to move him to another institution.
> Assessment: He wants to be transferred to another institution. He wants no soy in his food.

(Exhibit 2, Par. 37, and Exhibit 32.)

75. On this date the Plaintiff was requesting Dr. Ameji to tell the Deputy Warden to have him transferred. He informed the Plaintiff that he did not have the authority to make transfers of inmates within the Illinois Department of Corrections. The Plaintiff is also requesting to receive no soy in his food. Again, Dr. Ameji informed him that he did not have the authority to change his diet as to soy. Furthermore, in Dr. Ameji's medical opinion, soy was good for a patient with hyperlipidemia such as Mr. Dolis. Soy is a good source of protein that is low cholesterol and low fat. (Exhibit 2, Par. 38.)

76. Dr. Ameji next visited with the Plaintiff on March 24, 2008. On that date he saw the Plaintiff for his requested renewals of his low bunk, low gallery permit. His note from that date states as follows:
> CT scan done on spine L-S on February 10, 2004. CT scan reveals L3-L4 are normal; L4-L5 is normal. CT scan revealed mild degenerative changes L5-S1. This CT scan does not say he has impingement of nerves. Bulging discs are not disc compromised, and is not sciatica. There is no need for special bunking.
> Plan: Discontinue low gallery. Discontinue low bunk. (Exhibit 2, Par. 39, and Exhibits 33 and 34.)

77. On this date, the Plaintiff was requesting a renewal of his low gallery, low bunk permits. Based on Dr. Ameji's physical examination and his examination of the medical records, he did not believe the Plaintiff required a low gallery, low bunk permit. (Exhibit 2, Par. 40.) The medical records indicate that on April 12, 2008 the Plaintiff refused to have an EKG performed. (Exhibit 2, Par. 41, and Exhibit 35.)

79. Dr. Ameji next saw the Plaintiff on July 7, 2008. The Plaintiff had reportedly injured his left foot in his housing unit. His note from that date states as follows:
> Preliminary upper x-ray showed fracture of third and fourth metatarsal. There is good amount of swelling. Will let swelling go down and will put cast on.
> Plan: No weight bearing. Wrap with Ace band around the foot during the day.
> (Exhibit 2, Par. 42, and Exhibit 36.)

80. On this date the Plaintiff reported having injured his left foot while in his housing unit on January 5, 2008. An x-ray was taken on January 7, 2008 which preliminarily revealed a fracture to the third and fourth metatarsal in his left foot. As a result Dr. Ameji instructed the Plaintiff to remain non-weight bearing, they would wait for the swelling to go down on the foot before they placed it in a cast. (Exhibit 2, Par. 43.)

81. Dr. Ameji next saw the Plaintiff on July 8, 2008. His note states as follows:
> Permission to apply cast taken orally. Tina Miles, LPN present at all times. Inmate was shown the x-ray where he had fractured, non-displaced fracture, left metatarsal x2. Next full cast applied. Absolutely no weight bearing. Daily check casted foot for 1) Color. 2) Swelling. 3) Capillary filling. 4) Any neurological damage, etc. x5 days.

(Exhibit 2, Par. 44, and Exhibits 37 and 38.)

82. Dr. Ameji next saw the Plaintiff on July 29, 2008. The Plaintiff came to the healthcare unit reporting having suffered a fall in his dorm. His note states as follows:
> Subjective: 46-year-old white male. 5'11" tall. Weight: 190 pounds. Per inmate complains he fell in dorm 2B in day room. Says as a result he twisted his ankle. Left foot three views. 7/7/2008 non-displaced fracture, proximal segment second, third, fourth metatarsals of left foot. He told in front of Lieutenant Brown that he fell on the way to the shower. Incident report says he fell in shower. There are contradictory statements given by the inmate. Hence Lieutenant called. I told Lieutenant of this contradiction. My plan at this time was to perform an x-ray of the Plaintiff's left foot due to his complaints of left hip pain.

(Exhibit 2, Par. 45, and Exhibits 39 and 40.)

83. Dr. Ameji's final visit with the Plaintiff was on August 4, 2008 for his regularly scheduled chronic care clinic due to his hyperlipidemia. On this date, the Plaintiff's lipids, cholesterol, and triglycerides were reviewed. The Plaintiff's medications were reviewed and renewed. Additionally, Dr. Ameji provided the Plaintiff with education as to the importance of exercise and a low cholesterol, low fat diet. (Exhibit 2, Par. 46, and Exhibit 41.)

84. Following this final visit with the Plaintiff, he was transferred shortly thereafter to the Robinson Correctional Center. After the Plaintiff's transfer, Dr. Ameji did not manage the treatment or care of any of his medical problems. At no time did the Plaintiff suffer deliberate indifference to any serious medical need while under Dr. Ameji's care at the Danville Correctional Center. (Exhibit 2, Par. 47.)

85. While the Plaintiff did suffer from hyperlipidemia at all times the Plaintiff was under Dr. Ameji's care, they were managing his high cholesterol and hyperlipidemia through the use of medication as well as education on diet, and lifestyle. (Exhibit 2, Par. 48.)

86. In regards to the Plaintiff's complaints of his treatment for the alleged urethral stricture,

|       | Dr. Ameji performed the catheterization which revealed that the Plaintiff did not have a stricture that was obstructing urine flow. As such, the Plaintiff's physical condition did not indicate the need for surgical intervention. (Exhibit 2, Par. 49.) |
|-------|---|
| 87.   | As the medical records indicate, the Plaintiff never complained to Dr. Ameji in any way regarding blood or bleeding from his bowels. As such, Dr. Ameji could not possibly treat any problems if he did not bring them to Dr. Ameji's attention. (Exhibit 2, Par. 50.) |
| 88.   | Likewise, the Plaintiff never brought any concerns to his dental care to Dr. Ameji's attention. As indicated by the records, the Plaintiff never specifically told Dr. Ameji that he had a problem with cavities, or that he was suffering any pain due to cavities. (Exhibit 2, Par. 51.) |
| 89.   | Additionally, any problems the Plaintiff may have had in regards to dental needs would be directed to the dental health staff on site at the Danville Correctional Center. (Exhibit 2, Par. 52.) |
| 90.   | Likewise, the Plaintiff did not make any complaints to Dr. Ameji in regards to hearing problems. Once again, if the Plaintiff did not make complaints to Dr. Ameji in regards to healthcare, he could not provide treatment. In this case, the Plaintiff did not make any complaints to Dr. Ameji in regards to hearing problems; therefore, Dr. Ameji had no reason to believe it was an issue. (Exhibit 2, Par. 53.) |
| 91.   | Finally, Dr. Ameji did not have the authority as the medical director to dictate placement of an inmate within the Illinois Department of Corrections. Furthermore he did not have the authority to dictate where an inmate was celled within the Danville Correctional Center other than to place an inmate in the infirmary for a medical need. (Exhibit 2, Par. 54.) |
| 92.   | All treatment Dr. Ameji provided to the Plaintiff while at the Danville Correctional Center was based solely on his medical judgment, experience, and training. None of his decisions were based on policies of his employer, Wexford Health Sources, Incorporated. (Exhibit 2, Par. 55.) |
| 93.   | At all times relevant to this lawsuit, Dr. Ameji was licensed in the State of Illinois to practice medicine. (Exhibit 2, Par. 56.) |
| 94.   | In Dr. Ameji's opinion, he treated Mr. Dolis appropriately, as well as each and every one of the medical professionals who provided treatment and care for Mr. Dolis' medical problems. (Exhibit 2, Par. 57.) |
| 95.   | Dr. Ameji is no longer employed at the Danville Correctional Center. Accordingly he is not in a position to provide Mr. Dolis with any medical care. (Exhibit 2, Par. 58.) |

Discussion and Conclusion

Deliberate Indifference to a Serious Medical Need

Deliberate indifference to a serious injury or medical need violates a prisoner's rights under the Eighth Amendment to be free from cruel and unusual punishment. *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001), *citing Estelle v. Gamble*, 429 U.S. 153, 182-83 (1976). The injury or need must be objectively serious, *and* the official must personally know of the risk and consciously disregard it. *See Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999); *Mathis v. Fairman*, 120 F.3d 88. 91 (7th

Cir. 1997); *Wynn v. Southward*, 251 F.3d at 593 (2001). An objectively serious injury or medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Chapman*, 241 F.3d at 845, *quoting Zentmyer v. Kendall County* 220 F.3d 805, 810 (7th Cir. 2000)(*quoting Gutierrez v. Peters* 111 F.3d 1364, 1373 (7th Cir. 1997)). An objectively serious condition also presents itself if "'failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain.'" *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999), *quoting Gutierrez*, 111 F.3d at 1373.

In order to prove his claims, the Plaintiff must prove deliberate indifference to a serious medical need. At a minimum, this requires actual knowledge of impending harm which is easily preventable so that a conscious, capable refusal to prevent harm can be inferred from the defendants' failure to prevent it. *Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997); *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985). Deliberate indifference is more than mere negligence and approaches intentional wrongdoing. Farmer v. Brennan, 511 U.S. 825, 835 (1994). To establish deliberate indifference, Plaintiff must show the Defendants ignored a known risk. Collignon v. Milwaukee County, 163 F.3d 982, 988 (7th Cir. 1998).

Additionally, in order to establish deliberate indifference, Plaintiff must show that the Defendants must both have been aware of the fact from which the inference could be drawn that a substantial risk of serious harm exists, and they must actually draw the inference. *Higgins v. Correctional Medical Services*, 178 F.3d 508, 511 (7th Cir. 1999); *Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir. 1995). The exercise by a physician of his professional judgment does not constitute deliberate indifference. *Youngberg v. Romeo*, 457 U.S. 307, 322-323 (1982). Medical decisions, such as whether one course of treatment is preferable to another, are beyond the Eighth Amendment's purview. Additionally, the Eighth Amendment is not a vehicle for bringing claims of medical malpractice. *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). It should also be kept in mind that inappropriate medical treatment based on pure negligence, or even a series of purely negligent acts is not the same as indifference to a serious medical need. *Sellers v. Henman*, 41 F.3d 1100, 1102-03 (7th Cir. 1994).

A prisoner has the right to medical care, but he does not have the right to determine the type and scope of the medical care he personally desires. The Eighth Amendment does not require that prisoners receive "unqualified access to healthcare." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *see also, Hernandez v. Keane*, 341 F.3d 137 (2d Cir. 2003). Rather, inmates are entitled only to "adequate medical care." *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002). Specifically, the Eighth Amendment does not entitle an inmate to demand specific care. A difference of opinion between a physician and the patient does not give rise to a constitutional right, nor does it state a cause of action under Section 1983. Disagreement with a doctor's treatment decisions cannot be the basis for an Eighth Amendment challenge. *Steele v. Choi*, 82 F.3d 175, 178-79 (7th Cir. 1996); *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). *See also, Johnson v. Doughty*, 433 F.3d 1001 (7th Cir. 2006). Inattention to a medical condition amounts to a constitutional violation only where the medical condition is serious. *Brownell v. Figel*, 950 F.2d 1285, 1289 (7th Cir. 1991). As previously indicated, deliberate indifference may only be

found when an official knows of and disregards an excessive risk to inmate health or safety. *See Duane v. Lane*, 959 F.2d 673, 676 (7th Cir. 1992). Deliberate indifference also requires that Defendants either intended to harm Plaintiff or knew of a risk of harm so significant that an intent to harm could be inferred from a refusal to provide medical care. *See Smith-Bey v. Hospital Administrator*, 841 F.2d 751, 759 (7th Cir. 1988).

Personal Involvement

An individual is liable under § 1983 only if he or she was "'personally responsible for the deprivation of a constitutional right.'" *Sanville v. McCaughtry*, 266 F.3d 724, 739 (7th Cir. 2001), *citing Chavez v. Illinois State Police*, 251 F.3d 612, 652 (7th Cir. 2001); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Personal responsibility means participating directly in the constitutional violation or directing the unconstitutional conduct. Thus, a supervisory official cannot be held liable in a § 1983 action unless he had a direct, personal involvement in the alleged constitutional deprivation. *See Moore v. State of Indiana*, 999 F.2d 1125, 1129 (7th Cir.1993). The personal involvement requirement is met when a prison official acts in deliberate disregard of the plaintiff's constitutional right, or the constitutional deprivation occurs at the official's direction or with her consent or knowledge. *Black v. Lane*, 22 F.3d 1395, 1401 (7th Cir.1994).

Monell Claim

To establish liability against the Wexford under § 1983, Plaintiff must first establish that his constitutional rights were violated. *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571, 1573, 89 L. Ed. 2d 796 (1986). Failure to prove the underlying claim results in the failure of a Monell claim against a city. *See Monell v. Department of Social Service of City of New York*, 436 U.S. 658, 691, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978); *Ojeda- Beltran v. Lucio*, 2008 WL 2782825 (N.D. Ill. July 16, 2008). Even if summary judgment would not be granted on the underlying claim against Dr. Ameji, summary judgment must be granted in favor of Wexford because the Plaintiff has failed to identify a policy or custom that caused Plaintiffs' alleged injuries or an action by Wexford that was taken with deliberate indifference as to its known or obvious consequences. *See Monell*, 436 U.S. at 694, 98 S. Ct. at 2036-37; *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 109 S. Ct. 1197, 120, 103 L. Ed. 2d 412 (1989) ("Only where an entity's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its patients can such a shortcoming be properly thought of as a 'policy or custom' that is actionable under § 1983."). Wexford may be liable for actions resulting in violations of constitutional rights only when the conduct of its official or agent is executed pursuant to a policy or custom. Monell, 436 U.S. at 694, 98 S. Ct. at 2036-37. "To establish a policy for § 1983 purposes, plaintiffs must show either (1) an express policy that, when enforced, causes a constitutional deprivation; or (2) that the constitutional injury was caused by a person with final policymaking authority." Montano v. City of Chicago, 535 F.3d 558, 570 (7th Cir. 2008). To establish 'custom' for § 1983 purposes, the plaintiff must show 'a widespread practice that, although not authorized by written or express policy, is so permanent and well settled as to constitute a custom. Montano, 535 F.3d at 570, The Supreme Court has emphasized that the unconstitutional acts of an agent cannot, standing alone, lead to Monell liability; there is no respondeat superior liability under § 1983. Monell, 436 U.S. at 692-95, 98 S. Ct. at 2036-38.

Wexford may only be liable where its policies are the "'moving force [behind] the constitutional violation.' " Canton, 489 U.S. at 389, 109 S. Ct. at 1205 (quoting Monell, 436 U.S. at 694, 98 S. Ct. at 2038).

The Plaintiff has offered no evidence to suggest that he suffered any deliberate indifference at the hands of Dr. Ameji or Wexford Sources in regard to his allegations that his prescribed medicals was not provided. The Plaintiff admits that Dr. Ameji is not involved in the claim set out in paragraph A of his complaint. Plaintiff states that Dr. Ameji was upset when he learned that Plaintiff was not receiving the medication prescribed. Furthermore, the medical records indicate and Plaintiff admits, that the entire time the Plaintiff was under Dr. Ameji's care at the Danville Correctional Center he was prescribed cholesterol lowering medication. Plaintiff also seems to suggest that Dr. Ameji was deliberately indifferent in the treatment of what plaintiff believes to be a heart condition. However, there is no verifying medical evidence that the plaintiff has ever suffered from a heart condition. To the contrary, Dr. Ameji specifically states that while plaintiff did have hyperlipidemia, he does not suffer from a heart condition. Plaintiff also admits that he has never been told by any medical professional that he suffers from a heart problem. Likewise, Plaintiff admits that he has no evidence to suggest that any policy or procedure of Wexford has contributed to his allegations of his medicine being improperly supplied. Furthermore, Plaintiff has no evidence to suggest that any Wexford policy has contributed to a violation of his rights. In fact, as noted above Plaintiff has no evidence that he suffered a constitutional violation. Without an underlying constitutional violation Wexford cannot be found liable for Plaintiff's allegations.

Plaintiff complained of a problem with a urethral stricture. The undisputed medical evidence indicates that once Plaintiff made complaints to Dr. Ameji, he was evaluated and a plan of care was developed. Specifically, Dr. Ameji performed a collegial consultation with Dr. Arthur Funk of Wexford Health Sources, Inc on October 3, 2007. The result of that collegial consultation was the plan to insert a catheter in the urethra to determine the exact placement and existence of the stricture. Dr. Ameji informed the Plaintiff of this plan of care and the plaintiff consented. The procedure was performed on October 18, 2007. A catheter was inserted in the plaintiff's urethra easily and no obstructive stricture was found by Dr. Ameji. Dr. Ameji has catheterized literally hundreds of patients in his career and properly performed the procedure on the plaintiff. Dr. Ameji did not find a stricture as evidenced by his ability to easily pass the catheter into the plaintiff's bladder. Further, no residual urine was produced by the catheterization, indicating that plaintiff was able to void his bladder. There is no medical evidence to suggest that Dr. Ameji's treatment of the plaintiff's alleged stricture problem constituted deliberate indifference. There is no evidence in the record before the court that Dr. Ameji's care provided to the Plaintiff's for his uretha problem was inappropriate. Likewise, without evidence of deliberate indifference Wexford cannot be found liable for the allegations regarding plaintiff's stricture. Furthermore, the Plaintiff laintiff admits that he has no evidence that any Wexford practice or procedure was the impetus for any alleged denial of any medical care regarding his stricture.

Further, Plaintiff never made complaints to Dr. Ameji during his numerous visits

regarding gastrointestinal problems.   There is no evidence to suggest that Plaintiff ever made complaints to Dr. Ameji regarding his alleged intestinal problems.  The medical records indicate that while plaintiff was seen several times he never complained to Dr. Ameji regarding any intestinal problems.  The medical records indicate that after Plaintiff was transferred to the Robinson Correctional Center (and out of Dr. Ameji's care) he began complaining of bloody stools.  As a result of those complaints, plaintiff was provided a colonoscopy which was unremarkable. The plaintiff also admits that his intestinal problems were not so severe as to prevent him from refusing a scheduled colonoscopy so that he could attend commissary.  Plaintiff also admits that since he has made these complaints he has received a lower GI.  There is no evidence to suggest Dr. Ameji had any personal involvement in any of the care provided to plaintiff for his alleged intestinal problems.  Likewise, Wexford cannot be found liable without any underlying finding of deliberate indifference.  Plaintiff has not produced any medical evidence that he has suffered a serious medical need or that his need was met with deliberate indifference. Plaintiff did not  bring complaints to the medical staff's attention until after he was transferred to the Robinson Correctional Center. Even then, Plaintiff admits that he has received a colonoscopy, which was unremarkable. Therefore, there can be no finding of deliberate to plaintiff's alleged intestinal problems.

Plaintiff admits that Dr. Ameji was not involved in his claims regarding his dental care.  However, he alleges Wexford has been deliberately indifferent.  Plaintiff admits that he does not have any evidence that any Wexford policy or procedure has led to any deliberate indifference of his dental needs.  The Defendants states  that there is no medical evidence to suggest that plaintiff has a serious dental need.  Tooth decay can constitute an objectively serious medical condition because of pain and the risk of infection. *Board v. Farnham,* 394 F.3d 469, 480-81 & n. 4, 482-83 (7th Cir.2005); *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) (tooth cavity presented serious medical condition).  *See also Berry v. Peterman,* 604 F.3d 435 (7th Cir. 2010).  Plaintiff admits that he has never suffered any pain as a result of his cavities.  Plaintiff discovered he had two cavities during a routine dental checkup at the Danville Correctional Center.  He was informed that he would be placed on the waiting list to have the cavities filled.  Plaintiff somehow believes that because he must wait to have his cavities filled that his rights have been violated.  His belief is incorrect.   A significant delay in effective medical treatment by a prison doctor may support a prisoner's Eighth Amendment claim of deliberate indifference, especially where the result is prolonged and unnecessary pain.  *See Grieveson v. Anderson,* 538 F.3d 763, 779 (7th Cir.2008) (reversing summary judgment for defendants where plaintiff did not receive treatment for painful broken nose for nearly two days), citing *Gutierrez v. Peters,* 111 F.3d 1364, 1371-72 & n. 6 (7th Cir.1997) (collecting cases).  Based on Plaintiff's admission that his cavities do not cause him a pain (and never have), his two cavities are not serious medical needs.   Further, in the instant case, the delay does not support a claim of deliberate indifference to a serious medical need. Defendants advise the court that Plaintiff has access to dental professional should a serious need arise. There is no evidence Wexford has any policy or procedure that violates plaintiff's rights.

Plaintiff also claims that his rights have been violated because he does not have a hearing aid. The medical records reflect that plaintiff did not ever bring any concerns regarding his hearing to Dr. Ameji. Furthermore, plaintiff admits that he can carry on a conversation without the aid of an assistive device. Plaintiff complains that when there is background noise he sometimes has trouble hearing. During the entire course of his deposition, the Plaintiff was able to hear every question clearly and carry on a conversation without any difficulty whatsoever. There is no evidence on this record that plaintiff's alleged hearing problems are serious. Plaintiff's difficulty hearing when there is background certainly would not affect his daily living to the point of indicating the 8th amendment. Moreover, plaintiff admits that he has no evidence that any policy or procedure of Wexford is the reason he does not have a hearing device. The reason plaintiff received medical attention for his hearing difficulty at Danville was because he did not bring them to the attention of medical staff.

Next, Plaintiff alleges that soy in his diet is causing him health problems. Plaintiff admits that he does not have any medical evidence to support this contention. In fact, Dr. Ameji states that in his medical opinion, soy is a good source of protein for the Plaintiff because soy is low in cholesterol. Further, Plaintiff admits that no doctor has ever linked any of his alleged medical problems to the consumption of soy food products. Furthermore, Dr. Ameji does not have the authority to alter the amount of soy protein contained in the diets prepared, and served by the Illinois Department of Corrections. Likewise, Wexford Health Sources, Inc. is not responsible for creating or preparing the diet provided to the inmates at the Danville Correctional Center. The grievance response from the Administrative Review Board of the Illinois Department of Corrections clearly indicates that the decision on how much soy is included in the diet of the inmates is mandated from Springfield, or in other words, by the Illinois Department of Corrections agency headquarters. The Plaintiff has presented no evidence that he has an allergy to soy. Thus, the court finds against that Dr. Ameji and Wexford have not been deliberately indifferent to him regarding the soy in his diet.

Finally, Plaintiff alleges that he suffered violation of his right to equal protection of the laws by not being transferred from the Danville Correctional Center when he requested a transfer. In his complaint, Plaintiff does not make reference to either Dr. Ameji or Wexford Health Sources. Defendants advise the court that initially, the decision to transfer an inmate rests solely with the Illinois Department of Corrections. Further, as noted in the co-defendants' motion for summary judgment, the plaintiff was denied his requested transfer due to bed space issues. (Exhibit D to co-defendants' Motion for Summary Judgment.) There is no evidence to suggest that Dr. Ameji had any personal involvement in the alleged violation of plaintiff's equal protection rights. Likewise, there is no evidence to suggest that any policy or procedure of Wexford played any role in placement of the plaintiff within the Illinois Department of Corrections.

There are no genuine issues of material fact in this case regarding the claims raised by the Plaintiff against Dr. Ameji and Wexford Health Sources, Inc. Plaintiff has presented no evidence to suggest that his constitutional rights were violated in any manner by Dr. Ameji or Wexford

Health Sources, Inc. Therefore, these Defendants are granted summary judgment.

It is therefore ordered:

1. The Defendants' motion for summary judgment is granted [78]. The clerk of the court is directed to enter judgment in favor of all the Defendant and against the Plaintiff. All pending motions are denied as moot, and this case is terminated in its entirety, with the parties to bear their own costs.
2. If the Plaintiff wishes to appeal this dismissal, he must file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a strike under 28 U.S.C. 1915(g).
3. Although the Plaintiff's lawsuit is dismissed, he is still obligated to pay the filing fee in full.

Enter this   17th     day of March 2011.

**\s\Harold A. Baker**

_____
Harold A. Baker
United States District Judge